1  Keith Galiano
   132 Upland Circle
2  Corte Madera, CA
3  (415) 924-0849
   keithg21@aim.com
4
5  Plaintiff Pro Se.
6
7
8              UNITED STATES DISTRICT COURT
9            NORTHERN DISTRICT OF CALIFORNIA
                SAN FRANCISCO DIVISION
10
11  KEITH GALIANO,                    Case No. C07-05557 MJJ
12          Plaintiff,
13
    vs.
14
15  INSTITUTE OF GOVERNMENTAL
    STUDIES AT THE UNIVERSITY OF
16  CALIFORNIA AT BERKELEY, an
    unincorporated association, NICK
17  ROBINSON, DOES 1-5, inclusive,
18
            Defendants.
19
20
21
22         PLAINTIFF'S MEMORANDUM OF LAW IN
       OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
23          PURSUANT TO FRCP 12(B)(1) AND (6)
24
25
26
27
28

Plaintiff's Opposition to Motion to Dismiss
Case No.  C07-05557 MJJ

1

# TABLE OF CONTENTS

2

3

Introduction ……………………………………………………………………..     1

4

Argument ………………………………………………………………………     3

5

I.      IGS IS THE CORRECT ENTITY DEFENDANT
        BECAUSE IT HAS CAPACITY UNDER STATE
6       AND FEDERAL LAW …………………………………………………….  3

7

II.     THE IGS REGULATION IS PRESUMPTIVELY INVALID …………………. 7
8

9       III.    THE DAMAGE CLAIMS AGAINST ROBINSON ARE
                ADEQUATELY PLEADED ……………………………………………….10

10

11      IV.     ROBINSON IS NOT ENTITLED TO QUALIFIED IMMUNITY ……………..14

12      V.      PLAINTIFF HAS PROPERLY PLEADED CLAIMS UNDER
                THE BANE ACT ……………………………………………………… .17

13

14      VI.     PLAINTIFF IS ENTITLED TO PRELIMINARY
                INJUNCTIVE RELIEF …………………………………………………….20

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

Cases

3    *Austin B. v. Escondido Union Sch'l Dist.,*
      149 Cal.App.4th 860 (2007) …………………………………………………………………18

4    *Baca v. Moreno Valley Unified School. Dist.,*
5      936 F.Supp. 719 (C.D. Cal. 1996) ……………………………………………………… 8

6    *Barr v. United Methodist Church,*
      90 Cal. App.3d 259, 266 (1979) ………………………………………………………....4
7
     *Bomar v. Keyes,*
8      162 F.2d 136 (2d Cir. 1947); cert. den. 332 U.S. 825 (1947) …………………….................12

9    *Brandhove v. Tenney,*
      183 F.2d 121 (9th Cir. 1950) …………………………………………………………………12
10
     *Braxton v. Municipal Court,*
11     10 Cal. 3d 138 (1973) …………………………………………………………………… 15

12   *Campbell v. Regents of University of California,*
      35 Cal.4th 311 (2005) …………………………………………………………………………3

13   *Carreras v. City of Anaheim,*
14     768 F.2d 1039 (9th Cir. 1985) …………………………………………………………………9

15   *Chandler v. McMinnville School Dist.,*
      978 F.2d 524  (9th Cir. 1992) ………………………………………………………….....11

16   *City of Long Beach v. Bozek,*
17     31 Cal. 3d 527 (1982) …………………………………………………………………… 11

18   *Cohen v. California,*
      403 U.S. 15 (1971) …………………………………………………………………….. .9

19   *Duarte v. City of Nampa,*
20     2007 U.S. Dist. LEXIS 19900 (D. Idaho 2007) …………………………………………….....6

21   *Duran v. City of Douglas,*
      904 F.2d 1372 (9th Cir. 1990)……………………………………………………………………17

22   *E.E.O.C. v. St. Francis Xavier Parochial School,*
23     77 F.Supp.2d 71 (D.D.C. 1999) ……………………….  ……………………………………..5

24   *Elrod v. Burns,*
      427 U.S. 347 (1976) ……………………………………………………………………….20

25   *Faith Center Church Evangelistic v. Glover,*
      480 F.3d 891 (9th Cir. 2007) ……………………………………………………………....14
26
     *Freeman v. City of Santa Ana,*
27     68 F.3d 1176 (9th Cir. 1995) ……………………………………………………………. 14

28

1
2      *Galbraith v. County of Santa Clara*,
       307 F.3d 1119 (9th Cir. 2002) ...................................................................... 13

3      *Gathright v. City of Portland*,
       439 F.3d 473 (9th Cir. 2006) ......................................................................... 7

4      *Grossman v. Portland*,
5      33 F.3d 1200 (9th Cir. 1994) ........................................................................ 15

6      *Hagberg v. California Federal Bank*,
       32 Cal.4th 350 (2004) ..................................................................................... 19

7      *Heffron v. International Soc'y for Krishna Consciousness, Inc.*,
8      452 U.S. 640 (1981) .......................................................................................15

9      *Houston v. Hill*,
       482 U.S. 451, 107 S.Ct. 2502 (1987) ..............................................................7

10     *Johnson v. Chilcott*,
       599 F.Supp. 224 (D.Colo. 1984) ..................................................................... 4
11
       *Kivalina Relocation v. Teck Cominco Alaska*,
12     27 F.R.D. 523 (D. Alaska 2004) ......................................................................5

13     *Kreimer v. Bureau of Police*,
       958 F.2d 1242 (3rd Cir. 1992) ........................................................................8
14
       *Marder v. Lopez*,
15     450 F.3d 445 (9th Cir. 2006) ........................................................................... 3

16     *Mills v. Alabama*,
       384 U.S. 214 (1966) ...................................................................................... 10
17
       *Mitchell v. Forsyth*,
18     472 U.S. 511 (1985) .......................................................................................16

19     *Monroe v. Pape*,
       365 U.S. 167, 81 S.Ct. 473 (1961) .................................................................10
20
       *Morgan v. Woessner*,
21     997 F.2d 1244 (1993) .....................................................................................17

22     *Nelson v. Geringer*,
       295 F.3d 1082 (10th Cir. 2002) .....................................................................10

23     *OEI v. N. Star Capital Acquisitions, LLC*,
24     486 F.Supp.2d 1089 (C.D. Cal. 2006) ...........................................................19

25     *O'Toole v. Superior Court*
       140 Cal.App.4th 488 .....................................................................................18

26     *Pareto v. F.D.I.C.*,
27     139 F.3d 696 (9th Cir. 1998) .........................................................................12

28     *Perry v. Sinderman*,
       408 U.S. 593 (1972) .......................................................................................10

Plaintiff's Opposition to Motion to Dismiss
Case No. C 07-05557 MJJ

*Rabkin v. Dean,*
856 F.Supp. 543 (N.D. Cal. 1994) ................................................................ 18

*Sammartano v. First Judicial District Court,*
303 F.3d 959 (9th Cir. 2002) ....................................................................8

*Sierra Ass'n for Environment v. F.E.R.C,*
744 F.2d 661 (9th Cir. 1984) ....................................................................4

*Smithson v. Aldrich,*
235 F.3d 1058 (8th Cir. 2001) .................................................................12

*Souders v. Lucero,*
196 F.3d 1040 (9th Cir. 1999) .................................................................14

*Thompson v. City of Los Angeles,*
885 F.2d 1439 (9th Cir. 1989) ..................................................................7

*Tinker v. Des Moines Independent Community School Dist.,*
393 U.S. 503 (1969) ............................................................................7

*United States v. Mendenhall,*
446 U.S. 544 (1980) ..........................................................................12

*Venegas v. County of Los Angeles,*
32 Cal. 4th 820 (2004) .......................................................................17

*Will v. Michigan Dep't of State Police,*
491 U.S. 58, 109 S.Ct. 2304 (1989) ...........................................................6

*Willowbrook v. Olech,*
528 U.S. 562, 564 (2000) .....................................................................13

<u>Statutes</u>
42 U.S.C. section 1983 ........................................................................10

Cal. Civil Code section 47, subd. (b) ..........................................................19

Cal. Civil Code section 52.1 ...................................................................18

Cal. Penal Code Section 626.6 .................................................................13

<u>Treatises</u>

5 Witkin, Summary of California Law, §501, et seq. .............................................20

## INTRODUCTION

1

2      The Institute of Governmental Studies (IGS) claims to have a generally applicable policy

3  prohibiting users of its public library, on the Berkeley campus, from speaking to each other about

4  the subject of quiet. IGS does not give notice of the policy, and library "Code of Conduct" does

5  not mention it [Ex. 7]. The childish rule, if it really exists, requires even the mildest hint about

6  quiet to be filtered through library staff. As a flat ban on protected speech that is fully

7  appropriate to a library and not inherently disruptive, the policy is presumptively invalid on its

8  face, bearing a heavy burden of justification. At the least it is unconstitutional as applied, being

9  invoked even when the request substantially meets the call of the rule. Thus plaintiff's

10  suggestion — "not quite so loud please?" — went to a person standing within arm's length of the

11  librarian to whom she was speaking. In the First and Second claims for relief, plaintiff seeks a

12  declaration of the policy's invalidity, and an injunction not only against the rule's further

13  application, but also against a tandem policy under which library officials forbid any attempt to

14  question a novel and arbitrary rule. This relief is sought against both IGS and Robinson, the

15  library Director.

16      The flat prohibition on unchaperoned speech is only the start of the IGS assault on

17  individual rights. Any attempt to question the rule sparks vindictive retaliation. Thus when

18  plaintiff tried to ask if the rule actually existed or was aimed solely at him, Robinson summarily

19  booted him from the library on pain of meeting the police. This was a reprisal for exercise of the

20  basic right to reasonably question officials about public policy. Because that right is so well-

21  established, Robinson cannot have qualified immunity for this retaliatory deprivation of

22  otherwise available library use. Not only a violation of 42 U.S.C. § 1983, the exclusion also

23  violated California's Bane Act, which prohibits "interference" with constitutional rights through

24  intimidation or coercion (threat of police intervention).

25      When plaintiff returned to the library exactly one week later (and was not asked to leave),

26  it was as a matter of right. Under Cal. Penal Code § 626.6, an exclusion from a campus facility,

27  even where lawful to avoid disruption of "the peaceful conduct of the activities of the ... facility,"

28  may not exceed one week absent special written notice. Though doubtless aware of the law,

1

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

Robinson nevertheless retaliated again, making a false trespassing report that caused campus police to detain plaintiff for investigation, a deprivation of plaintiff's liberty interest. This act too was retaliation for plaintiff's speech the week before, and so for it as well, a violation of both § 1983 and the Bane Act, qualified immunity is improper as both the speech it sought to punish and the physical liberty it affected were well-established constitutional rights. Robinson is sued in his individual rather than his official capacity, and as to him there can be no colorable issue of Eleventh Amendment immunity, or of this court's jurisdiction. In addition, plaintiff asks the court to recognize that the retaliation claims against Robinson are independent of the attack on the "no speech" policy. Because they do not depend on the success of the First and Second claims for relief, they survive even if the court does not strike down the policy against speech about quiet.

IGS ratified Robinson's conduct, and expressly conditions plaintiff's resumption of library use on his agreement to surrender all speech about quiet. Thus the deprivation of library use that began on July 16, 2007 and was extended a week later, continues to this day. Plaintiff never returned to the IGS library after July 23, 2007, and can only assume he is subject to additional false reports of "trespassing," with consequent police detention, for questioning any arbitrary rule IGS might care to invoke.

In order to invoke Eleventh Amendment immunity, the Regents of the University of California ("Regents") pretend they are IGS and thus the real defendant. This requires ignoring IGS' unique hybrid status. IGS enjoys near-total financial and operational independence from the university, receiving only 24% of its funding from the Regents and having a large private endowment and an independent earning capacity. Under controlling law, these facts invest IGS with capacity to be sued in its own name, apart from the Regents. Since the Regents are not the entity defendant, this action is not against any "arm of the state" with Eleventh Amendment immunity, and so there is no jurisdictional bar. It is also undisputed that the IGS library itself, source of the dispute, is independent of the campus library system, meaning that the prospective relief sought would have no effect on the university at large.

2

1    Finally, defendants append extrinsic evidence in the form of university web-page

2    declarations. Plaintiff therefore does so as well. The eight exhibits attached to this Opposition

3    are university-generated documents whose authenticity is undisputed (and also admissions as to

4    which no hearsay issue exists). If necessary to permit their consideration, plaintiff asks the court

5    to convert the motion to one for summary judgment. See, *Marder v. Lopez*, 450 F.3d 445

6    (9th Cir. 2006).

7                                    ARGUMENT

8                                         I.

9              **IGS IS THE CORRECT ENTITY DEFENDANT BECAUSE**
              **IT HAS CAPACITY UNDER STATE AND FEDERAL LAW**

10

11    The Regents have no role in this action. The capacity of IGS to be sued in federal court

12    is controlled by FRCP 17(b) and 17(b)(1). Citation to *Campbell v. Regents of University of*

13    *California*, 35 Cal.4th 311 (2005) is unavailing. That opinion states only that the Regents have

14    authority to place an administrative exhaustion requirement in an employee handbook. The

15    holding is that despite being a state constitutional entity, the Regents are "not entirely

16    autonomous" and are subject to legislation addressing "... matters of statewide concern not

17    involving internal university affairs ..." 35 Cal.4th at 321. General rules governing capacity for

18    suit are obviously matters of statewide concern.

19    The following facts are determinative of IGS' independent capacity for suit:

20        • IGS has a common mission. http://igs.berkeley.edu/about_igs/ [Ex. 1];

21        • The IGS mission is directed by a National Advisory Council composed entirely of
          private entities. http://www.igs.berkeley.edu/about_igs/nac.html. [Ex. 2];

22

23        • IGS is only 24% funded by the Regents.
          (http://www.igs.berkeley.edu/about_igs/friends.html#benefactors) [Ex. 3];

24

25        • IGS has an income-generating capacity and an endowment of $5.7 million.
          http://igs.berkeley.edu/about_igs/dir_intro.html [Ex. 4];

26

27        • IGS has nine active "research projects," all privately financed.
          http://igs.berkeley.edu/research_programs/active_research.html [Ex. 5];

28

                                          3

- The IGS Library is independent of the campus library system; (http://igs.berkeley.edu/library/overview.html) [Ex. 6].

Capacity Under California Law

IGS qualifies as an "unincorporated association" under California law, and therefore may be sued in federal court pursuant to Rule 17(b), which looks to the law of the state in which the forum sits.   The California definition of unincorporated association is "liberal." *Johnson v. Chilcott*, 599 F.Supp. 224, 230 (D.Colo. 1984)[discussing cases].  In California, "[t]he criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a **common purpose**, and (2) who function under a common name under circumstances where **fairness** requires the group be recognized as a legal entity." *Barr v. United Methodist Church*, 90 Cal. App.3d 259, 266 (1979). Such "[f]airness includes those situations where persons dealing with the association contend their legal rights have been violated," and to that end "[f]ormalities of quasi-corporate organization are not required." *Id.*, 90 Cal. App.3d at 266-267. The rule exists as a convenience for plaintiffs, and is available so long as the entity sued is more than a mere label. *Johnson v. Chilcott*, supra, 599 F. Supp. at 221.

As seen above, IGS has the requisite common mission, which is to "serve as a bridge between academia and the intersection of politics, policy and the media," [Ex. 1].  That mission is directed by a National Advisory Board comprised of private entities ("distinguished individuals representing the corporate, philanthropy, non-profit, professional, and academic sectors ... .") [Ex. 2].  And the IGS library, source of the censorship at issue, is independent of the campus system generally [Ex. 6].  Under California law, it is obviously "fair" to require IGS to defend in its own name.

Capacity Under Federal Law

Where a defendant lacks capacity to be sued under state law, Rule 17(b)(1) accords plaintiffs a preemptive "safe harbor."  Where, as here, the action seeks to enforce a "substantive right existing under the laws of the United States," federal courts apply their own test of "unincorporated association," and state law is irrelevant. *Sierra Ass'n for Environment v.*

4

*F.E.R.C*, 744 F.2d 661, 662 (9th Cir. 1984). Thus even if IGS somehow lacked capacity under California law, it would still be suable in federal court under federal law. One purpose of Rule 17(b)(1) is to "prevent state law from frustrating the enforcement of federal substantive rights ..." *E.E.O.C. v. St. Francis Xavier Parochial School*, 77 F.Supp.2d 71, 77 (D.D.C. 1999). Defining "unincorporated association" as "a voluntary group of persons, without a charter, formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective," federal courts impose the additional requirement that the entity be able to pay a judgment. It is undisputed that IGS is financially self-sufficient, receiving only 24% of its funding from the Regents [Ex. 3]. It boasts of an independent income-generating capacity, and a private endowment of $5.7 million [Ex. 4]. Its current research projects, i.e. its very *raison d'etre*, are privately financed [Ex. 5]. The only rational conclusion is that IGS could easily pay any judgment likely to be rendered in this relatively modest case.

The primacy of the financial ability requirement is illustrated in *E.E.O.C.*, *supra*. In that case, a parish school attached to an Archdiocese was found not to satisfy the definition of an "unincorporated association" because its corporate parent "exerts varying degrees of control over different aspects of the Parish's operations," and "archdiocese approval is required for any expenditure exceeding $10,000." 77 F.Supp.2d at 75. Noting authority to the effect that an entity whose assets are wholly owned by its parent is a mere corporate "division," the court stated:

> The rationale for this precedent is, above all, pragmatic, as an unincorporated division does not possess separate assets; all of its assets are owned by the corporation (citation). Thus, '[u]nless the organization is liable there can be no levy of execution against the division's assets, and if the organization is not liable none of its assets can be used to **satisfy the judgment**.'

77 F.Supp.2d at 75 [emphasis supplied]. Because IGS can pay a judgment, it is clearly pragmatic to require it to defend in its own name.

Finally, a minor connection with a governmental unit does not preclude status as an "unincorporated association." Cases the Regents might cite for that proposition are easily distinguished. For example, in *Kivalina Relocation v. Teck Cominco Alaska*, *supra*, 27 F.R.D. 523 (D. Alaska 2004), the question was whether such an association could consist of individuals

5

appointed to a Relocation Planning Committee ("KRPC") by local governing bodies. The court found that these persons were not "members" of the committee and that the only actual members were the appointing civic units, i.e. a borough, a city, and a village. 227 F.R.D. at 527. Noting that Rule 17(b)(1) does not apply to "governmental units, subdivisions, agencies or committees" [citing *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992)(sheriff's department)], the court stated:

> The six individuals in this case do not possess any of the indicia of members of an unincorporated association. They do not: determine who may serve on KRPC, do not finance the functions or scope of authority of KRPC, do not control the continued existence of KRPC, nor do they bear the ultimate responsibility for the acts or actions of KRPC. All of these powers and attributes are retained by the Borough, City and/or Village.

Thus in *Kivalina*, the Rule 17(b)(1) "safe harbor" was unavailable because the subject entity was a dependent subset of an actual governing body, a village. In other words, for *Kivalina* to have any application, the Regents would have to show both that IGS is actually engaged in governing (not just research about government technique), and that IGS depends on the Regents to finance and direct the projects making up its mission. That showing cannot be made, because it is undisputed that IGS is both directed by private entities and predominantly funded by them.

Similarly unavailing to the Regents is *Duarte v. City of Nampa*, 2007 U.S. Dist. LEXIS 19900 at *8-9 (D. Idaho 2007). That case involved a city police department, a political subdivision that is neither self-financed nor self-directed, again entirely unlike IGS.

In sum, despite an origin in the university, the politics mavens of IGS have a common mission reaching far beyond it, and the clear ability to pay any likely judgment without resort to the treasuries of the university or the state. It is therefore appropriate to treat IGS as an "unincorporated association" and require it to defend in its own name. Since IGS, not the Regents, is the proper entity defendant, Eleventh Amendment immunity does not apply and there is no obstacle to the court's jurisdiction. [1]  There is also no "person" issue under § 1983. That

---

[1] The Eleventh Amendment would in any event not apply to claims against Robinson in his personal capacity. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304 (1989).

6

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

issue is coextensive with the Eleventh Amendment inquiry. *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989) ["States or governmental entities considered 'arms of the state' for Eleventh Amendment purposes are not persons within the meaning of § 1983."].

## II.

## THE IGS REGULATION IS PRESUMPTIVELY INVALID

In *Houston v. Hill*, 482 U.S. 451, 461 (1987), the Supreme Court stated that even provocative or challenging speech "is nevertheless protected against censorship or punishment, unless shown likely to produce a **clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.' "** [quoting *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 895-96, (1949) (emphasis added)]. In *Gathright v. City of Portland*, 439 F.3d 473 (9th Cir. 2006), it was said that "[f]irst amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space." Not that anything plaintiff said, at least initially, was in any way provocative or offensive. He politely asked — "not quite so loud please?" — and received a gracious "sorry" in return [A.C. ¶13].

In derogation of well-established constitutional guarantees, defendants contend there is no problem with flatly banning adults from asking each other for quiet in the IGS library because:

**"[E]ngaging other patrons directly — could lead to disputes and disruption."**
[p. 6, lines 11-12.]

That claim obviously stands free speech law on its head. No court has ever upheld across-the-board censorship of anything like the innocuous speech involved here. Because asking for quiet in a public library is appropriate and traditional to such a forum, speculation about possible "disputes" is not nearly sufficient to outweigh the interest in speaking freely. "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 508 (1969).

7

As an initial matter, defendants are incorrect about the applicable standard. In the case of pure speech that is both protected (i.e. not obscene, defamatory, commercial, or "fighting words"), and intrinsically appropriate to a library, the applicable test is not "reasonableness." Thus in *Kreimer v. Bureau of Police*, 958 F.2d 1242 (3rd Cir. 1992), which involved a rule against offensive hygiene, a reasonableness test was applied only to library rules aimed at non-expressive conduct reasonably expected to disturb other patrons, such as staring or stalking. 958 F.2d at 1263, fn. 24. The court acknowledged that for expressive activity compatible with the forum, *Tinker* is the controlling authority. *Kreimer*, supra, 958 F.2d at 1263, fn. 25.

In reality, the authorities most applicable to this case are *Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719 (C.D. Cal. 1996), and *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir. 2002). Under *Baca* and *Sammartano*, defendants' policy can only be justified by a showing of a substantial history of material disruption of library operations resulting from mere quiet requests. Of course, if any such history actually existed, the IGS library's detailed "Code of Conduct" would address the subject [Ex. 7].

In *Baca*, a school board rule prohibited all criticism of school employees at board meetings on the ground such criticism might be defamatory. Accepting that such speech might sometimes be defamatory, the *Baca* court nevertheless found the mere prospect insufficient, describing the rule as "censorship" and granting a preliminary injunction against it. The court assumed, as defendants do here, that the forum at issue was a "limited public forum." In such a forum the state may categorically proscribe only subjects that are "irrelevant" to the business at hand. 719 F.Supp. at 730 [citing *White v. City of Norwalk*, 900 F.2d 1421, 1424-25 (9th Cir. 1990)], and may not flatly prohibit a content category that is relevant to the forum unless necessary to achieve a compelling governmental interest, the same standard that would apply to a true public forum. 936 F.Supp. at 730. [2]

The censorship at work here is essentially indistinguishable from that in *Baca*. Whereas in *Baca* the ban ran to all public speech critical of school district employees, in this case the IGS

---

[2] *Baca* recognizes that the California Constitution provides even greater protection for expressive activity than the First Amendment. See also, *Carreras v. City of Anaheim*, 768 F.2d 1039, 1044, n. 7 (9th Cir. 1985)

ban runs to all direct speech about "quiet and the like," no matter how polite or diffident. The main differences are that in *Baca* the rule had actually been promulgated, while here it is not, and in *Baca* the goal of protecting reputations was at least substantial, while here the IGS goal apparently is nothing more than ego palliation. In view of *Baca*, the IGS policy must be evaluated under "strict scrutiny," with defendants required to show that asking for quiet necessarily presents an actual, material threat to library operations, unless we are to believe that the subject of quiet is somehow "irrelevant" to use of a library.

In *Sammartano*, the court reversed the denial of a preliminary injunction in the case of a rule that prohibited the wearing of clothing bearing motorcycle club insignia in a state courthouse. The *Sammartano* court held that under *Cohen v. California*, 403 U.S. 15 (1971), such a rule could not be "rendered constitutional" by the expedient of merely presuming the subject clothing might "incite problems," and that the applicable test could not be mere "reasonableness." The court stated (303 F.3d at 969):

> "Most significantly, *Cohen* stands for the proposition that even in light of the purposes of the forum, it is not reasonable to prohibit speech in courthouse hallways merely because it may offend some people's sense of decorum.

The *Sammartano* analysis applies here *a fortiori*. After all, defendants indulge in the same kind of presumption about "problems" as the courthouse officials in *Sammartano*, and here the speech affected is pure speech, whereas in *Sammartano* it was at best symbolic or indirect, having no necessary connection with use of the forum.

In sum, fear about possibly sensitive reactions to a quiet request is not a "compelling interest," and so under *Baca* and *Sammartano*, the flat ban on asking for quiet in a public library is at least presumptively invalid and likely to be stricken. Plaintiff is therefore entitled to a preliminary injunction now against continued application of the rule. As a direct result of this misconceived policy, plaintiff has already lost six months of library use, which constitutes irreparable injury.

9

## III.

## THE DAMAGE CLAIMS AGAINST ROBINSON ARE ADEQUATELY PLEADED

The two essential elements of a claim under § 1983 are (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that such conduct caused deprivation of a right, privilege or immunity secured by the Constitution. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473 (1961). Preliminarily, the court should note that argument about the propriety of the supposed speech rule itself is misplaced in evaluating plaintiffs' damage claims under § 1983 and the Bane Act. The retaliation/interference claims are not founded upon, and are wholly independent of, the status of the supposed regulation. Since plaintiff's right to question government officials without reprisal does not depend on the viability of the speech regulation itself, liability for retaliation exists even if the subject regulation somehow survives attack.

A.    The Library Ejection Constituted Retaliation For Exercise Of Free Speech

Plaintiff has alleged that when Robinson appeared to issue his admonition: (1) plaintiff suggested discussing the matter outside; (2) Robinson insisted on staying in the library; (3) but for staff the library was empty when plaintiff began to question the policy; and (4) Robinson ordered him to leave the library on pain of meeting the police before plaintiff could even finish voicing a suspicion that the policy might be aimed solely at him [A.C. ¶14]. Under these facts, plaintiff's ejection from the library was an actionable "deprivation," accomplished through coercion, in retaliation for the constitutionally guaranteed attempt to question a government official (however petty) on an issue of public policy. These allegations satisfy the requirements of both § 1983 and California's Bane Act. The benefit affected, such as library use, need not rise to the level of a property right. *Nelson v. Geringer*, 295 F.3d 1082, 1099 (10th Cir. 2002) [citing *Perry v. Sinderman*, 408 U.S. 593, 596-98 (1972).]

A major purpose of the First Amendment was to protect "free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966). The right of petition, moreover, "is essential to protect the ability of those who perceive themselves to be aggrieved by the activities of governmental authorities to seek redress through all the channels of government." *City of*

10

*Long Beach v. Bozek*, 31 Cal. 3d 527, 535 (1982). It also does not matter that plaintiff's intended speech to Robinson, asking him to prove the actual existence of a novel rule, was only indirectly "political." As stated in *United Mine Workers v. Illinois Bar State Bar Ass'n.*, 389 U.S. 217, 223,

> "The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest."

In *Chandler v. McMinnville School Dist.*, 978 F.2d 524 (9th Cir. 1992), students were suspended for refusing to remove "scab" buttons that would have been perceived as insulting to temporary teachers. The court reversed a dismissal for failure to state a claim, holding that the district court wrongly viewed this speech as "inherently disruptive." The court stated:

> " ... where arguably political speech is directed against the very individuals who seek to suppress that speech, school officials do not have limitless discretion. 'Courts have a First Amendment responsibility to insure that robust rhetoric ... is not suppressed by prudish failures to distinguish the vigorous from the vulgar.' 978 F.2d at 531 [citing *Thomas v. Board of Educ. Granville Cent. School Dist.*, 607 F.2d1043, 1057 (2d Cir. 1979) (Newman, J. concurring), *cert. denied*, 444 U.S. 1081, 100 S.Ct. 1034 (1980)].

Under *Chandler*, Robinson could not threaten ejection merely because plaintiff implicitly questioned the extent of his authority, or for attempting to reason with him about the surprise invocation of a novel rule. His only valid option was to alert plaintiff to the rule and warn of possible discipline for an actual violation in the future. See also, *Pinard v. Clatskanie School Dist. 6J*, 446 F.3d 964 (9th Cir. 2006) (relying on *Chandler*) [no "public concern" requirement for speech to be protected in the school context].

Unable to deny the existence of a right to dispute public policy, defendants resort to challenging the propriety of the location where plaintiff tried to question Robinson, asserting that:

> **"... the quiet of the reading room is not a proper place for patrons to argue with staff over library policies."**
> (Pts. & Auth. I.S.O. Defendants' Motion to Dismiss, p. 6, lines 13-14.)

11

However, plaintiff has alleged that when Robinson said he "needed to talk," plaintiff suggested going outside while Robinson himself insisted on remaining in the library (doubtless so the desk librarian could be a witness). There was no actual "disruption" because the library was empty at the time anyway [A.C. ¶13], as it often is [A.C. ¶12]. Finally, plaintiff called Robinson a "son-of-a-bitch" only after Robinson ejected him, not before [A.C. ¶14]. All material allegations, and reasonable inferences therefrom, must be taken as true. *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998). Thus, even if defendants had any authority for their novel theory about proper arguing venue, at this stage of the case the retaliation claim based on the initial library ejection stands untouched.

B.   Robinson's Instigation of Police Detention Was A Violation of § 1983.

Plaintiff has alleged that on July 23, 2007 he returned to the IGS library and was not asked to leave, but that on leaving the building he was detained by the campus police, and ultimately arrested, because Robinson reported that plaintiff's return, one week after ejection, constituted "trespassing" [A.C. ¶17]. The police report shows clearly that in making his report of trespassing, Robinson was responding to plaintiff's speech the week before, including his threat to sue [Ex. 8].

It has already been seen that as a general rule, criticism of officials is protected speech. See also, *Smithson v. Aldrich*, 235 F.3d 1058 (8th Cir. 2001) [§1983 claim stated where bar owner arrested for criticizing police after being cited for noise violations]. The deprivation effected was that of being free from unreasonable personal seizure, in derogation of the Fourth Amendment liberty interest. A police detention for investigation, or "Terry stop" [*Terry v. Ohio,* 398 U.S. 1 (1968)], is a "seizure." *United States v. Mendenhall*, 446 U.S. 544, 552 (1980). Finally, it is not required that the deprivation be actually effected by the defendant, only instigated by him. *Bomar v. Keyes,* 162 F.2d 136 (2d Cir. 1947); cert. den. 332 U.S. 825 (1947) [principal liable, under predecessor statute, for instigating school board's firing of probationary school teacher]; *Brandhove v. Tenney,* 183 F.2d 121 (9th Cir. 1950) [members of state senate investigating committee liable, under predecessor statute, for inducing prosecution of misdemeanor as reprisal for plaintiff's refusal to answer questions]. Detention by the police, of

12

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

course, also satisfies the "coercion" requirement of the Bane Act. Robinson can evade liability only if, despite his retaliatory motivation, plaintiff's detention for investigation was independently supported by "reasonable suspicion" of crime.

Reasonable suspicion for detention was lacking because when plaintiff reappeared at the library after an absence of one week, it was as a matter of right, and plaintiff was a non-trespasser as a matter of law. In California, Penal Code §626.6 controls the subject of summary exclusions, of persons lacking official campus affiliation, from public university facilities. That statute limits such exclusions to a maximum of one week absent special written notice, which did not occur here. It was therefore legally impossible for plaintiff to have been trespassing at the IGS library on July 23, and the detention was "unreasonable" from the position of both Robinson and the officers. Reporting a crime that could not possibly have occurred is at least "reckless," and that is all that is required under § 1983. *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

## C.    The "Class of One" Equal Protection Claim is Proper

The pleaded equal protection claim is indeed of the "class of one" type. However, contra defendants' assertion, there is no requirement of membership in a "protected classification." The very authority cited in the motion, *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), holds that a "class of one" claim properly lies where plaintiff does **not** allege membership in such a class but does allege he was intentionally treated differently from others similarly situated, without rational basis. 528 U.S. at 564. In *Willowbrook*, plaintiffs alleged only that a village, as the price of connecting property to the municipal water supply, sought a 15-foot easement from other property owners but a 33-foot easement from plaintiffs, perhaps out of spite. Plaintiff's allegation — "no such rule has ever been invoked against any person other than plaintiff" — is a direct *Willowbrook* match for its claim that library users with an interest in quiet no different from his are not asked to filter quiet requests through library staff, while he is. This is the essence of arbitrariness. Absent a showing the rule has any actual history of application, a jury

13

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

can reasonably attribute its appearance here to staff resentment of a frequent user of age 50 who lacks an official university tie beyond an alumni card.

As to "rationality," in a venue where the relevant interest, as defendants concede, is tranquility for quiet contemplation, what could be more irrational than prohibiting only older persons or the already-degreed from directly seeking it?  Plaintiff anxiously awaits the "rational" explanation for such differential treatment.  As to this, defendants' citations are wildly off point. *Faith Center Church Evangelistic v. Glover*, 480 F.3d 891, 910 (9th Cir. 2007) is not an equal protection case.  Neither is *Souders v. Lucero*, 196 F.3d 1040 (9th Cir. 1999), whose rule is that a campus' generally "open" nature does not trump a criminal protective order issued after multiple incidents of stalking.  Plaintiff was always a peaceful and compliant user of the IGS library [A.C. ¶12].  In *Freeman v. City of Santa Ana*, 68 F.3d 1176 (9th Cir. 1995), the subject dance permit was denied by reference to an actually promulgated standard, i.e. the bar's location in a "high-crime" area.  By contrast, here the finding of disparate treatment follows precisely from the fact that the subject rule can't be shown to exist.  To fill the vacuum, defendants pretend that the very seeking of (relative) quiet necessarily disrupts it, obvious sophistry not to be indulged.  As for *Julian-Bey v. Crowley,* no such case appears to be reported, at least not by the ostensible citation 2000 U.S. Dist. LEXIS 14071, *17 (W.D. Mich. 2000).  In any event it would be inapposite, since the state's interest in security at a prison would obviously be heightened, and the extent of individual rights accordingly curtailed.  Finally, one would think the Amended Complaint fairly reeks of intentionality.  If necessary, plaintiff will amend to clarify that the differential treatment suffered was "intentional."

## IV.

## ROBINSON IS NOT ENTITLED TO QUALIFIED IMMUNITY

It is undisputed that Robinson ejected plaintiff from the IGS library (an exclusion that effectively continues to this day) because he tried to question Robinson about the novel "no speech" rule, an attempt that Robinson quashed *in utero* [A.C. ¶14].  Defendants have not made the slightest showing that plaintiff's right to do so was anything but well-established in July 2007.  An official's claim of qualified immunity will be defeated if, "in light of pre-existing law,"

14

the unlawfulness of his conduct was "apparent." *Grossman v. Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994).

Library Ejection

The federal and state claims arising from the initial library rejection do not stand or fall on the enforceability of the IGS speech prohibition itself. Thus, whether plaintiff had a well-established right to engage Robinson in at least preliminary questioning about the novel rule is a question entirely separate from that about the policy's merits. So defendants miss the mark in asserting that: (1) a library is entitled to enforce its rules "selectively," and (2) the right to speak to others in a public library is not clearly established. Those justifications relate to the substance of the rule, not plaintiff's right to inquire about it.

There are several reasons why the unlawfulness of Robinson's conduct was apparent in July 2007. First, and most broadly, the California Supreme Court declared long ago that criticism of the government is "absolutely privileged," including threats to sue. *City of Long Beach v. Bozek*, 31 Cal. 3d 527, 534 (1982). Second, it has long been established that unwritten rules, because they vest government actors with unlimited discretion, are "inherently inconsistent with the precision and objectivity that our First Amendment jurisprudence demands," and thus possibly invalid on that basis alone. *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981). An experienced professional such as Robinson therefore had to reasonably expect that sudden invocation of such a textless rule would arouse an inquiring reaction. Third, in *Braxton v. Municipal Court*, 10 Cal. 3d 138, 150 (1973), the California Supreme Court narrowly interpreted, so as to save them from oblivion, statutes authorizing exclusion from public campuses. The court interpreted Penal Code section 626.4 (nearly identical to §626.6) to permit exclusion from the campus only of one whose conduct or words are such as to constitute, or incite to, a **substantial and material disruption** incompatible with the peaceful functioning of the academic setting. The court cited *Terminello v. Chicago*, 337 U.S. 1, 4 (1949), for the proposition that

> "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger."

15

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

As a matter of law, then, Robinson could not possibly have felt immune to at least preliminary inquiry about the novel policy against asking for quiet. Plaintiff suggested conducting such a discussion outside the library, while Robinson insisted on remaining inside [A.C. ¶14]. And plaintiff called Robinson a "son-of-a-bitch" only after being ejected, not before [A.C. ¶14]. In any event, "manifest disrespect for the officer's authority" is not enough to overcome clearly established free speech principles. *Martiszus v. Washington County*, 325 F.Supp.2d 1160, 1171 (D.Or. 2004).

Defendants' citation to *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985) is inapposite. In that case, qualified immunity for the Attorney General was appropriate because the conduct at issue, a warrantless wiretap, was not declared unlawful until one year after the subject incident. 472 U.S. at 530. Also, none of the cases defendants cite offer the slightest support for the notion that a public facility may apply a rule, even if valid, to some patrons but not to others. As seen above, the closest defendants come to such authority is a case involving prisoners, whose civil rights are truncated in a way that plaintiff's are not.

Report of Trespassing

Exhibit 8 shows that in reporting plaintiff as a "trespasser" on July 23, 2007, Robinson was reacting to plaintiff's speech the week before. But that was hardly any speech at all, Robinson having immediately shut it down. Robinson seems to have been particularly concerned with plaintiff's threat to sue, but that threat was absolutely privileged. *City of Long Beach, supra*, 31 Cal. 3d at 535. Plaintiff also called Robinson a "son-of-a-bitch" after Robinson ejected him. However, in *Duran v. City of Douglas*, 904 F.2d 1372 (9th Cir. 1990), qualified immunity was denied, and summary judgment granted for plaintiff on his §1983 claim, where police detained and arrested plaintiff solely for profanity relating to his prior ejection from a bar. Citing *Houston v. Hill*, supra, the court stated:

> "government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity".

904 F.2d at 1378.

16

The same rule applied to Robinson on July 23, 2007.

Moreover, even if Robinson's report had not been driven by the unlawful motivation to punish plaintiff's speech, it would nevertheless have been wrongful under well-known law. Bad faith instigation of a seizure is a tort. *Morgan v. Woessner*, 997 F.2d 1244, 1260 (1993). The trespass report that instigated plaintiff's seizure was in knowing bad faith because reappearance at the IGS library on July 23 could not have been a trespass. Plaintiff had already stayed away for one full week, and summary exclusions, for any reason, are limited to one week absent special written notice (Penal Code §626.6). That statute exists precisely so that the concept of "trespassing" is not employed by university officials to accomplish an "end run" around constitutional protections for speech. *Braxton v. Municipal Court, supra*.

In short, it was apparent on July 23, 2007 that Robinson's specific conduct, in both its motivation and execution, was wrongful under established law.

## V.

## PLAINTIFF HAS PROPERLY STATED CLAIMS UNDER THE BANE ACT

Plaintiff has alleged three distinct instances of constitutional "interference" unlawful under the Bane Act — loss of library use on July 16, 2007, unlawful detention and arrest on July 23, 2007, and loss of library use after July 23, 2007 (still continuing) — all accomplished via threatened and actual use of the police, and all aimed at suppressing free speech.

The Bane Act (Cal. Civil Code § 52.1) is not limited to "hate crimes." In *Venegas v. County of Los Angeles*, 32 Cal. 4th 820 (2004), the California Supreme Court stated:

"In *Jones v. Kmart Corp.*, 17 Cal.4th 329, 338 [70 Cal.Rptr.2d 844], we acknowledged that Civil Code section 52.1 was adopted 'to stem a tide of hate crimes.' But contrary to County's position, our statement **did not suggest that section 52.1 was limited to such crimes**, or required plaintiffs to demonstrate that County or its officers had a discriminatory purpose in harassing them, that is, that they committed an actual hate crime. We continued in *Jones* by simply observing that the language of section 52.1 provides remedies for 'certain misconduct that interferes with' federal or state laws, if accompanied by threats, intimidation or coercion, and whether or not state action is involved."

32 Cal.4th at 843, [emphasis supplied].

17

1

2         There is also no requirement of physical touching. As the Supreme Court stated in *Jones*,

3    *supra*, the Bane Act requires only "interference with a legal right, accompanied by a **form of**

4    **coercion** 17 Cal. 4th at 334 [emphasis supplied]. See also, *O'Toole v. Superior Court*, 140

5    Cal.App.4th 488, 502 [noting "broad scope" of 'threat, intimidation or coercion' requirement].

6         Requiring a person to leave a library on pain of meeting the police is obviously not

7    "speech alone," but conduct, as is instigating an invalid criminal detention in bad faith. Since the

8    "Rules of Conduct" of the IGS library expressly state that "disturbance" will result in ejection,

9    possibly with police escort, Robinson knew he could depend on the campus police to enforce his

10    order to leave, and at least detain for identification anyone he described as a trespasser. "It is

11    well settled generally that a threat of arrest on a criminal charge in aid of the collection of a debt

12    constitutes **menace**." *Bridge v. Ruggles*, 202 Cal. 326, 330-331 (1927)[emphasis supplied].

13    Obviously, vindictive petty officials would have carte blanche to scuttle the First Amendment if

14    courts hold the proscribed "interference" to be absent unless the official uses his hands.

15         The cases defendants cite are simply inapposite. In *Austin B. v. Escondido Union Sch'l*

16    *Dist.*, 149 Cal.App.4th 860 (2007), the question of adequate pleading was not involved. Rather,

17    the opinion affirmed nonsuit on the Bane Act claim for lack of proof defendant's conduct

18    actually caused the minor plaintiffs to avoid school. Moreover, physical touching was discussed

19    only in the context of a claim for common law battery, not the Bane Act. In *Rabkin v. Dean*, 856

20    F.Supp. 543 (N.D. Cal. 1994), the conduct deficient under the Bane Act was a city council's

21    failure to approve a salary increase, which is obviously different in kind from coerced removal

22    from a library. Moreover, in assuming a requirement of a "threat of violence," the Rabkin court

23    specifically noted that no California court had yet interpreted the Act. 856 F.Supp at 552.

24    Obviously, that is no longer the case. The *Rabkin* court's speculation simply turned out to be

25    wrong.

26         Civil Code Section 47(b) Does Not Apply

27         As noted, plaintiff alleges three distinct acts of "interference" under the Bane Act. As to

28    the first, ejecting plaintiff from the library, it is obvious that Civil Code §47(b) could not apply

18

Plaintiff's Opposition To Motion To Dismiss
Case No. C07-05557 MJJ

because that act did not initiate or involve any "judicial or quasi-judicial proceeding." See generally, *OEI v. N. Star Capital Acquisitions, LLC*, 486 F.Supp.2d 1089 (C.D. Cal. 2006). The privilege can only be raised with respect to the second and third acts of interference, i.e. the instigation of plaintiff's detention on July 23, 2007 and the library use deprivation that necessarily resulted from the potential for additional such detentions after that date.

Defendants cite *Hagberg v. California Federal Bank*, 32 Cal.4th 350 (2004) for the proposition that despite being in malicious bad faith, Robinson's report of trespassing nevertheless qualifies for the §47(b) privilege. The easy answer to this is that in *Hagberg*, the Court expressly stated that the privilege would not apply in situations where the conduct complained of satisfied the elements of the tort of malicious prosecution. Here, although plaintiff has not separately alleged it, Robinson's phony report of crime did in fact constitute the tort of malicious prosecution.

"Malicious prosecution consists of the initiation and maintenance of legal proceedings against another with malice and without probable cause." 5 Witkin, Summary of California Law, §469, at p. 696 (citing cases). It is undisputed that when they arrived on the scene on July 23, the campus police were responding to a "proceeding" initiated by Robinson [Ex. 8]. As explained above, Robinson's report was in bad faith and without probable cause because plaintiff was at the library as a matter of right, as he had already suffered an exclusion of one full week, the maximum possible under a venerable statute, Penal Code § 626.6. The final requirement, favorable termination of the "proceeding," is satisfied for the same reason. If damages are limited to the detention itself, "reasonable suspicion" for that detention was lacking as a matter of law because it was legally impossible for plaintiff's appearance at the library on July 23 to have been a trespass. If the damage suffered also encompasses the arrest on the warrant and ensuing incarceration, then the favorable termination element is satisfied, at least for this stage of the litigation, by the allegation that the matter was dismissed the next day. "A voluntary dismissal, even one without prejudice, reflects on the merits. Although not res judicata, it is generally a favorable termination." 5 Witkin, Summary of California Law, §501 at p. 735. And, plaintiff has also alleged that the warrant itself was simply a mistake, resulting from the fact that

19

the underlying citation requiring the court appearance did not show up in the court's system when plaintiff appeared to pay it [A.C. ¶17]. In sum, under *Hagberg*, Civil Code §47(b) does not apply.

The court should also decline to apply the §47(b) privilege on an entirely separate ground. In *Hagberg*, *supra*, the California Supreme Court specifically noted that plaintiff had not alleged violation of any constitutionally based right. By contrast, here the "interference" was with constitutional rights to speech and liberty. The vindication of such rights cannot be subordinated to a mere statutory privilege. The court in *OEI*, *supra*, adopted a similar approach in declining to apply §47(b). 486 F.Supp.2d at 1100-1101.

## VI.

### PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF

In the Ninth Circuit, a plaintiff is entitled to a preliminary injunction on a showing of either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in [his] favor." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir. 2002). In *Elrod v. Burns*, 427 U.S. 347, 37 (1976), the Court stated that the loss of First Amendment freedoms, for even minimal periods of time, "unquestionably constitutes irreparable injury." Plaintiff has already lost over six months of library use. Therefore, irreparable injury is conclusively shown, and the key inquiry becomes the likelihood of success on the merits.

As shown above, the IGS policy banning speech about quiet is likely to fall under the weight of *Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719 (C.D. Cal. 1996), and *Sammartano*, *supra*.. The court should therefore grant a preliminary injunction now, saving all concerned much time and effort in the coming months.

Dated:      February 5, 2008.

Keith Galiano
Plaintiff Pro Se

20

## DECLARATION OF SERVICE

On February 5, 2008, I served the attached document:

**Plaintiff's Memorandum in Opposition to Motion to Dismiss**
E PROPOSED ORDER (Kg)

on counsel for defendants in this matter by delivering same by hand to the following address:

Michael A. Laurenson, Esq
Gordon & Rees
Embarcadero Center West
275 Battery Street, Suite 2000
San Francisco, CA 94111

I declare under the laws of the State of California that the foregoing is true and correct.

Keith Galiano

Declaration of Service

Exhibit 1



## Mission Statement

The Institute of Governmental Studies (IGS), established in 1919, is an Organized Research Unit of the University of California at Berkeley. The IGS mission is to conduct and disseminate research on topics related to state and national politics and public policy topics with a particular focus on institutional design and reform. IGS serves as the University's primary center for advancing research and public service on applied political science and public policy. IGS serves students, faculty, researchers, and the general public.

The IGS mission is to inform the construction and debate of reform proposals through applied research disseminated whenever possible through non-technical reports and public conferences. IGS serves as a bridge between academia and the intersection of politics, policy and the media.

---

### ABOUT THE INSTITUTE

- Director's Introduction
- An Overview of IGS
- History
- Research Overview
- Active Research Projects
- Research in the Works
- Funding Opportunities
- NSF Grant Proposal Quick Guide
- Public Service

- People
- Staff
- Contacts
- Visiting Scholars
- Associated Faculty
- Graduate Students
- Directions to the Institute
- Friends of IGS
- IGS Faculty Advisory Committee
- IGS National Advisory Council

Exhibit 2



About IGS ::: National Advisory Council

# IGS National Advisory Council

The IGS National Advisory Council is responsible for providing guidance and direction to advance the Institute's development and outreach efforts. Membership is composed of distinguished individuals representing the corporate, philanthropy, non-profit, professional, and academic sectors that are affiliated with the IGS mission. Below is the 2007-2008 roster of membership.

**Note:** For biographies of individual council members, please click on each council member's name in the list below. For printer-friendly biographies, click the print box next to each council member's name, which will take you to a separate printer-formatted bio page.

In addition, a full compendium of IGS National Advisory Council member biographies is available as a PDF document here.

## IGS Inaugural Salon Dinner

The IGS Inaugural Salon Dinner was held on March 17, 2007 at The Anderson Ranch in Kenwood, California. For links to the invitation to this event, to photographs of the event, and to a brief biography of the speaker, Shibley Telhami, please visit the event web photograph album.

## National Advisory Council Member Biographies

**Darius Anderson**    print

*Chair*
Platinum Advisors

**Douglas Boxer** ['88]  | print |
Renewable Resources Group

**William Brandt**  | print |
Development Specialists Inc.

**Bryan Cameron**  | print |
Dodge & Cox Funds

**Darek DeFreece** ['93]  | print |
Wells Fargo Bank

**Stephen Dodson** ['99]  | print |
Parnassus Investments

**James Fang** ['85]  | print |
Asian Week

**Karen Getman**  | print |
Remcho, Johansen & Purcell

**Peter Hart**  | print |
Peter D. Hart Research Associates

**Kevin Johnson** ['87]  | print |
St. HOPE Public Schools

**Priya Mathur** [MBA '03]  | print |
California Public Employees' Retirement System (CalPERS)

**Laurence Pelosi** ['94]  | print |
Morgan Stanley

**Dan Schnur**  | print |
Edelman Public Relations

**Lisa Suennen** ['86, MA '87]  | print |
Psilos Group

**Duf Sundheim**  | print |

**Kris Van Giesen** ['87]  | print |

Exhibit 3

Friends of IGS Newsletter Summer 2000 (pdf format)

# IGS MEMORIAL FUNDS AND LECTURES

Nelson W. Polsby Memorial Graduate Student Fund

Victor Jones Memorial Lecture on Metropolitan Governance

# FRIENDS OF IGS HONOR ROLLS

Friends of IGS Honor Roll 2006

# IGS BENEFACTORS

IGS has benefited from the generosity of numerous benefactors. Some notable IGS benefactors include:

Joseph P. Harris
Franklin K. Lane
Dorothy C. Tompkins
Eugene C. Lee
Darius Anderson
William Brandt, Jr.
Fred Martin, Jr.

# IGS GIFTS

Gift from Darius and Sarah Anderson, October 2007

# HOW GIFTS TO IGS ARE USED

University financial support of the Institute accounts for only 24% of total annual IGS funding. The remainder of the IGS operating budget comes from a variety of sources: endowment income, contracts and grants, faculty opportunity funds, federal, state and local extramural funds, revenue generating enterprises and private gifts and donations. The importance of private development and fundraising activities as an essential component of the Institute's fiscal future has taken on a new sense of urgency. Simply stated, without a strong base of private donor support, IGS cannot compete and maintain its excellence in serving as the University's primary center for the interdisciplinary study of American politics, governance and public policy.

To address this emerging imperative, the Friends of IGS was established in 1995 as an official University-sanctioned outside support group. Friends is a donor club that channels much needed fresh financial resources into Institute activities and programs. Membership in Friends is automatic once a gift, no matter how small, is given to IGS. The benefits from joining Friends are many, but most important is the fact that by giving an individual, firm, or foundation is directly contributing to maintaining the excellence of Berkeley. Members also receive a special annual newsletter, automatic free subscriptions to the Public Affairs Report and IGS Calendar, and the intrinsic reward of knowing that their dollars are helping to prepare the next generation of leaders who study and train with IGS as students. In addition, all contributions are tax deductible.

Exhibit 4

IGS serves the needs of its students in several ways. First, we employ both undergraduate and graduate students in faculty-led collaborative projects on such topics as Constitutional Revision, the California Political Reform Act study, and the Blanket Primary. Second, we give graduate students research apprenticeship appointments and small direct grants to support their own studies and to foster their independent creativity based on need and merit. Third, IGS uses students for as many administrative support functions as possible, providing a valuable form of financial aid for undergraduates and places the most capable undergraduates into faculty-led research teams.

## Extramural Funds

IGS has raised over $4 million in the last five years in extramural funding from such diverse sources as the California State Legislature, Public Policy Institute of California, Ford Foundation, National Science Foundation, and the U.S. Department of Education. On an annual basis, the IGS Library generates about $120,000 in research service contracts and enterprises; the IGS Press generates $110,000 in book sales; and the Statewide Database generates $540,000. In addition, IGS receives about $40,000 to $50,000 annually from private donations and has a current endowment worth almost $5.8 million

## Research

IGS has demonstrated in recent years an ability to organize and fund path-breaking research in the areas of institutional design and reform. The Constitutional Revision and Blanket Primary projects drew together scholars from across the UC system and in several disciplines to analyze important contemporary institutional issues-specifically, how should the California Constitution be reformed, and what impact has the change in primary rules had on the political system? In addition, IGS sponsors an extensive array of seminars on topics from game theory to political history, creating an intellectually stimulating environment that facilitates new advances in the social sciences.

## Resources and Facilities

Part of the IGS mission is facilitating and disseminating research. IGS has several resources that cannot be found anywhere else in the state that allow it to play this role. The IGS Library is a valuable and unique national collection of fugitive research materials. The Statewide Database provides merged census and political data in a GIS format that will be used by the state of California and many localities for redistricting purposes in 2001. IGS Press is a model of success in small press social science publishing and is poised to enter into more formal collaborations with UC Press and other campus social science units.

## Public Service

In addition to our conferences and seminars, IGS provides valuable public service to the campus and state of California in various ways. The Institute regularly hosts visits by public officials to the campus and is charged by the chancellor's office to improve campuswide contacts with state government leaders. The Institute is the key campus resource for information about politics and public policy for members of the press and general public. The IGS Library and Statewide Database answer thousands of public queries every year. IGS serves a very critical role as the point for entry into the university for congressional, state legislative and executive officials and local government leaders.

We encourage you to survey our website and become more acquainted with our resources and

Exhibit 5



## Institute of Governmental Studies | UC Berkeley

# Active Research Projects

| Principal Investigator | Project Title | Funding Agency |
|---|---|---|
| Cain, Bruce E. | Immigration, Segregation and Urban Tension in France and California | France Berkeley Fund |
| Cain, Bruce E. | Nesting and Redistricting in California | James Irvine Foundation |
| Citrin, Jack | Immigration, Ethnic Diversity and Democratic Inclusion | Berkeley Futures Research Grant Program |
| Rasky, Susan | A Survey of the Political Attitudes and Patterns of Political Participation of the Iranian American Community | Private Research Gift |
| Roland, Gerard | Voteworld: Comparative Legislative Behavior | National Science Foundation |
| Schickler, Eric | Collaborative Research: The American Mass Public in the 1930s and 1940s | National Science Foundation |
| Simon, Jonathan | Mental Illness and the Law | San Francisco Foundation |
| | | |

| Vogel, David J. | California-EU Regulatory Cooperation Project | German Marshall Fund of the United States |
| Vogel, David J. | Managing Biosafety and Biodiversity in a Global World: EU, US, California and Comparative Perpectives | European Commission |
| Weir, Margaret | Federalism and Strategies for Reform in American Health Policy | Robert Wood Johnson Foundation |

Active Research Projects ::: About IGS ::: Research in the Works

Exhibit 6



**Library**
**Institute of**
**Governmental**
**Studies**

109 Moses Hall #2370
University of California
Berkeley, CA 94720-
2370

(510) 642-1472
(510) 643-0866 (f)

Home    Sitemap    Search

# Overview

The Institute of Governmental Studies Library is one of the nation's premier libraries of nontrade and ephemeral materials on American public affairs and policy. Pamphlets and unbound reports from a broad spectrum of public interest organizations, research institutes and government agencies are the heart of the collection. The Library also has a strong core collection of books and journals on American political science and public administration.

The Library has served the research and public service mission of the Institute of Governmental Studies for over 70 years. It was organized in 1921 at the founding of the Institute, then known as the Bureau of Public Administration, and has evolved into a large specialized library serving not only Institute scholars but the University community and the general public.

With continuing advances in information technology, the Library's resources have expanded to include not only the on-site collection, but the online resources of the digital age. The Library remains a repository of unique and valuable materials, and it also offers state-of-the-art electronic information services.

The Library is one of several large specialized libraries on the Berkeley campus affiliated with research institutes and professional schools, and independent of the campus library system.

## Staff

**Nick Robinson**, Library Director
**Frank Lester**, Electronic Services Librarian
**Mark Takaro**, Library Assistant, Chief Cataloger
**Ben Burch**, Library Assistant, Serials, Stack & Purchasing Manager
**Paul King**, Library Assistant, PPIC Liaison

*To* Collection

Exhibit 7



**Library**
**Institute of**
**Governmental Studies**

109 Moses Hall #2370
University of California
Berkeley, CA 94720-
2370

(510) 642-1472
(510) 643-0866 (f)

| Home | Sitemap | Search |
|------|---------|--------|

*Back to the Collection*

## Library Code of Conduct

### Introduction

The IGS Library strives to provide for its authorized users:

1. access to library materials or an ability to recall them according to library policy
2. journals, documents and books that are complete and unmarked
3. surroundings and library collections free from the problems caused by food, beverages, and other damaging substances
4. a library environment suitable for reading, study and activities in support of campus research and instructional programs.

### Prohibited Behaviors

 top

Certain behaviors, detailed below, are in conflict with these goals.

### *Use and protection of the Collections*

1. Removing or attempting to remove library materials, equipment or property without proper checkout or other official library authorization.
2. Failing to either renew or return library materials when due.
3. Concealing library materials in the Library for the exclusive use of an individual or group.
4. Mutilating library materials by marking, underlining, removing pages or portions of pages, removing binding, removing electronic theft devices, using post-its and paper clips or in any other way damaging or defacing library materials.
5. Eating and drinking in the Library.
6. Smoking in buildings or near entrances and exits.
7. Use of smokeless tobacco.
8. Failing to adhere to copyright laws, including systematically downloading, printing, or disseminating content from UCB-licensed electronic resources in violation of

copyright laws.

## *Use and protection of the building and library equipment* 

9. Being in unauthorized areas of the Library, remaining in the Library after closing or when requested to leave during emergency situations, drills or when not abiding by The Library's Conduct Policy.
10. Opening emergency exits except in emergency situations.
11. Parking wheeled vehicles in unauthorized areas outside or inside the Library.
12. Vandalizing or defacing the Library building, furniture or equipment.
13. Maliciously accessing, altering, deleting, damaging or destroying any computer system, network computer program or data.

## *The Library Environment* 

14. Causing a disturbance or engaging in any behavior which interferes with Library activities. Proscribed behavior includes (but is not limited to) verbal abuse, threats of violence, sexual harassment, or use of "fighting words" to harass any person. (See "The University of California at Berkeley Code of Student Conduct)
15. Rollerblading, skateboarding or skating on Library property.
16. Carrying weapons in the Library unless authorized by law.

## *Library fees* 

17. Failing to pay library fees.

## Sanctions 

Any patron who commits or attempts to commit any of the offenses listed above -- or any other behaviors illegal under the laws of the state or federal government -- is subject to sanctions, including

- •being a sked to leave Library premises;
- •being re ported to the police; and
- •l egal prosecution.

*Back to the Collection*

Exhibit 8

| CONTINUATION REPORT | UNIVERSITY OF CALIFORNIA | | 2. CASE NUMBER 07-03073 |
|---|---|---|---|
| 1. ☒ INCIDENT REPORT | POLICE DEPARTMENT | | |
| ☐ CRIME REPORT | BERKELEY | | |
| ☐ ARREST REPORT | CA 0019700 | | 3. PAGE 1 OF 1 |

| 4. TYPE REPORT | 5. CODE SECTION/DESCRIPTION N/A | 6. CRIME Warrant Arrest | |
|---|---|---|---|
| ☐ ORIGINAL ☒ SUPPLEMENT | | | |
| 7. INCIDENT DATE 07/12/07 TIME 1453 | 8. INCIDENT LOCATION Bridge south of Moses Hall | | 9. ADDL. NAMES ATTACHED ☐ YES ☒ NO |

10. NARRATIVE

On 07/23/07 at approximately 1453 hours, I was dispatched to the report of a trespasser in the library located in room 109 Moses Hall. As I approached the building from the south I was contacted by (RP) ROBINSON, Nicholas Keith (MW-53-E). (RP) ROBINSON, the director of the Moses Library, informed me that a subject who had previously been asked to leave the library had returned to the library. (RP) ROBINSON informed me that the subject had been disruptive, argumentative and verbally abusive in the library approximately two weeks ago (see case #07-02961). (RP) ROBINSON told me that before leaving the library the subject threatened to sue both (RP) ROBINSON and the University. (RP) ROBINSON pointed out the subject who was walking southbound towards the east breezeway of Barrows Hall.

The subject was a white male with brown hair wearing an off-white shirt and blue jeans. The subject turned and observed that (RP) ROBINSON and I were talking. The subject then started walking towards our location. The subject than began demanding to know what (RP) ROBINSON was talking to me about and what he was being accused of. Ofc. Watts #53 asked the subject to speak with him. Ofc. Watts identified the subject as (S) GALIANO, Keith Charles (MW-50-O). A records check of (S) GALIANO revealed a misdemeanor BART PD Warrant for 148.9(a) PC.

I attempted to discuss the situation that occurred in the library with (S) GALIANO and inform him that he needs to adhere to the rules of the library when using the library. (S) GALIANO became argumentative and verbally abusive with Ofc. Watts #53 and I. I placed (S) GALIANO under arrest for his outstanding warrant. (S) GALIANO was handcuffed by Ofc. Watts #53. I checked the handcuffs for proper fit and double locked them. Ofc. Watts #53 transported (S) GALIANO to BPD jail for me.

Nothing further.

CONTROLLED DOCUMENT
DO NOT DUPLICATE
UNIVERSITY OF CALIFORNIA
POLICE DEPARTMENT

Galiano   13 S   12-17-07
ROUTED TO   ROUTED BY   DATE

| 11.COPIES TO: ☒ DETECTIVES ☐ PATROL ☐ DISTRICT ATTY. ☐ RISK MGT. ☐ E.H&S ☐ OTHER ☐ OTHER | | |
|---|---|---|
| 12. REPORTING OFFICER N. Miller #32 | 13. DATE AND TIME 07/24/07 1400 | 14. APPROVING SUPERVISOR | 15. DATE |