Keith Galiano
132 Upland Circle
Corte Madera, CA
(415) 924-0849
keithg21@aim.com

Plaintiff Pro Se.



FILED

MAY 2 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

KEITH GALIANO,                          Case No.  C07-05557 SBA

        Plaintiff,

INSTITUTE OF GOVERNMENTAL
STUDIES AT THE UNIVERSITY OF
CALIFORNIA AT BERKELEY, an
unincorporated association, NICK
ROBINSON, DOES 1-5, inclusive,

        Defendants.
_____

PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

[Revised –Supersedes Submission of 2/5/08]

Plaintiff's Opposition to Motion to Dismiss [Revised]
Case No.  C 07-05557 SBA

<u>TABLE OF CONTENTS</u>

<u>Table of Authorities</u> ................................................................................................. ii

<u>Factual Background</u> ............................................................................................. 1

<u>Issues Presented</u> ................................................................................................. 2

<u>Argument</u> ............................................................................................................ 2

I.    IGS Has Capacity As An Unincorporated Association
      And The Regents Are Not A Party To The Action ....................................... 2

II.   The Flat Ban on Speech About Quiet Is An Invalid
      Content Regulation .................................................................................... 6

III.  The Damage Claims Against Robinson Are Adequately
      Pleaded ....................................................................................................... 10

IV.   Robinson Is Not Entitled To Qualified Immunity ....................................... 15

IV.   Plaintiff Has Properly Stated Three Violations
      of The Bane Act ....................................................................................... 17

VI.   Plaintiff is Entitled To Preliminary Injunctive
      Relief .......................................................................................................... 21

Plaintiff's Opposition to Motion to Dismiss [Revised]
Case No. C07-05557 SBA

TABLE OF AUTHORITIES

Cases

*Austin B. v. Escondido Union Sch'l Dist.,*
  149 Cal.App.4th 860 (2007) ................................................................ 18

*Baca v. Moreno Valley Unified Schol. Dist.,*
  936 F.Supp. 719 (C.D. Cal. 1996) ......................................................... 8

*Barr v. United Methodist Church,*
  90 Cal. App.3d 259, 266 (1979) ........................................................... 4

*Bomar v. Keyes,*
  162 F.2d 136 (2d Cir. 1947); cert. den. 332 U.S. 825 (1947) ..................... 12

*Brandhove v. Tenney,*
  183 F.2d 121 (9th Cir. 1950) .............................................................. 12

*Braxton v. Municipal Court,*
  10 Cal. 3d 138 (1973) ....................................................................... 7

*Campbell v. Regents of University of California,*
  35 Cal.4th 311 (2005) ....................................................................... 3

*Chandler v. McMinnville School Dist.,*
  978 F.2d 524  (9th Cir. 1992) ............................................................. 11

*City and County of San Francisco v. Ballard,*
  136 Cal.App.4th 381 (2006) ............................................................... 18

*City of Long Beach v. Bozek,*
  31 Cal. 3d 527 (1982) ...................................................................... 12

*Cohen v. California,*
  403 U.S. 15 (1971) ........................................................................... 9

*Crawford-El v. Britton,*
  93 F.3d 813 (D.C. Cir. 1996), vac. other grounds, 523 U.S. 574 (1998) ........ 5

*Dean v. Barber,*
  951 F.2d 1210 (11th Cir. 1992) ............................................................ 5

*Duarte v. City of Nampa,*
  2007 U.S. Dist. LEXIS 19900 (D. Idaho 2007) ........................................ 5

*Duran v. City of Douglas,*
  904 F.2d 1372 (9th Cir. 1990) ............................................................ 13

*E.E.O.C. v. St. Francis Xavier Parochial School,*
  77 F.Supp.2d 71 (D.D.C. 1999) ........................................................... 4

*Elrod v. Burns,*
  427 U.S. 347 (1976) ......................................................................... 21

*Faith Center Church Evangelistic v. Glover,*
  480 F.3d 891 (9th Cir. 2007) .............................................................. 14

ii

Plaintiff's Opposition to Motion to Dismiss [Revised]
Case No. C 07-05557 MJJ

*Fashion Valley Mall, LLC v. National Labor Relations Bd.,*
    42 Cal.4th 850 (2007) ................................................... 7

*First National Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) ................................................... 11

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ................................................... 9

*Freeman v. City of Santa Ana,*
    68 F.3d 1176 (9th Cir. 1995) ......................................... 14

*Galbraith v. County of Santa Clara,*
    307 F.3d 1119 (9th Cir. 2002) ........................................ 13

*Gathright v. City of Portland,*
    439 F.3d 473 (9th Cir. 2006) ......................................... 12

*Glair v. City of Los Angeles,*
    2008 U.S.Dist. (C.D. Cal.) [LX 24519] ................................ 11

*Grossman v. Portland,*
    33 F.3d 1200 (9th Cir. 1994) ......................................... 15

*Hagberg v. California Federal Bank,*
    32 Cal.4th 350 (2004) ................................................ 20

*Heffron v. International Soc'y for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981) .................................................. 15

*Hervey v. Estes,*
    65 F.3d 784 (9th Cir. 1995) .......................................... 16

*Jacques Interiors v. Petrak,*
    188 Cal.App.3d 1363 (1987) ........................................... 20

*Johnson v. Chilcott,*
    599 F.Supp. 224 (D.Colo. 1984) ....................................... 3

*Jones v. City of Modesto,*
    408 F.Supp.2d 935 (E.D. Cal. 2005) ................................... 14

*Kivalina Relocation v. Teck Cominco Alaska,*
    27 F.R.D. 523 (D. Alaska 2004) ....................................... 5

*Kolender v. Lawson,*
    461 U.S. 352 (1983) .................................................. 19

*Kreimer v. Bureau of Police,*
    958 F.2d 1242 (3rd Cir. 1992) ........................................ 8

*Kuba v. 1-A Agricultural Association,*
    387 F.3d 850 (9th Cir. 2004) ......................................... 7

*Lippoldt v. Cole,*
    468 F.3d 1204 (10th Cir. 2006) ....................................... 5

iii

Plaintiff's Opposition to Motion to Dismiss [Revised]
Case No. C 07-05557 MJJ

*Long v. Valentino,*
   216 Cal.App.3d 1287 (1989) ................................................. 18

*Los Angeles Alliance For Survival v. City of Los Angeles,*
   22 Cal.4th 352 (2000) ...................................................... 8

*Martinson v. Menifee,*
   2007 U.S.Dist. [LX 52591] ................................................ 13

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985) ...................................................... 16

*Monroe v. Pape,*
   365 U.S. 167, 81 S.Ct. 473 (1961) ........................................ 5

*Moreno v. Baca,*
   431 F.3d 633, 641 (9th Cir. 2005) ....................................... 19

*O'Toole v. Superior Court*
   140 Cal.App.4th 488 (2003) ............................................. 18

*Outdoor Media Group, Inc. v. City of Beaumont,*
   506 F.3d 895, 903 (9th Cir. 2007) ....................................... 10

*Pareto v. F.D.I.C.,*
   139 F.3d 696 (9th Cir. 1998) ............................................. 7

*People v. White,*
   (2003) 107 Cal.App.4th 636 .............................................. 19

*Pinard v. Clatskanie School Dist. 6J,*
   446 F.3d 964 (9th Cir. 2006) ............................................ 11

*Plyler v. Doe,*
   457 U.S. 202 (1982) ...................................................... 14

*Rabkin v. Dean,*
   856 F.Supp. 543 (N.D. Cal. 1994) ........................................ 18

*Regan v. Taxation With Representation,*
   461 U.S. 540, 546 (1983) ................................................. 9

*Reno v. American Civil Liberties Union,*
   521 U.S. 844, 880 (1997) ................................................ 10

*Sammartano v. First Judicial District Court,*
   303 F.3d 959 (9th Cir. 2002) ............................................. 9

*Sierra Ass'n for Environment v. F.E.R.C,*
   744 F.2d 661 (9th Cir. 1984) ............................................. 4

*S.O.C., Inc. v. County of Clark*
   152 F.3d 1136 (9th Cir. 1998) ............................................ 9

*Souders v. Lucero,*
   196 F.3d 1040 (9th Cir. 1999) ........................................... 14

iv

*Tinker v. Des Moines Independent Community School Dist.,*
  393 U.S. 503 (1969) ................................................................ 8

*United States v. Mendenhall,*
  446 U.S. 544 (1980) ................................................................ 12

*Venegas v. County of Los Angeles,*
  32 Cal. 4th 820 (2004) ...........................................................17

*Ward v. Rock Against Racism,*
  491 U.S. 781, 791 (1989) ......................................................... 9

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) .................................................. 20

*Will v. Michigan Dep't of State Police,*
  491 U.S. 58, 109 S.Ct. 2304 (1989) .......................................... 6

*Willowbrook v. Olech,*
  528 U.S. 562, 564 (2000) ....................................................... 13

Constitutional Provisions

California Constitution, Article I, Sec. 2 ...................................... 7

Statutes

42 U.S.C. section 1983 ............................................................ 10

Cal. Civil Code section 47, subd. (b) .......................................... 19

Cal. Civil Code section 52.1 .................................................... 18

Cal. Penal Code Section 626.6 ................................................. 13

Treatises

Tribe, Constitutional Choices (1985) ............................................ 7

4 Witkin, California Procedure §84 ............................................. 3

5 Witkin, Summary of California Law, §501, et seq. ......................... 20

v

Plaintiff's Opposition to Motion to Dismiss [Revised]
Case No. C 07-05557 MJJ

## FACTUAL BACKGROUND

The Institute of Governmental Studies claims to have a policy under which users of its public library, on the Berkeley campus, may not speak to each other about quiet. IGS does not give notice of the policy, and the library "Code of Conduct" does not mention it [Ex. 7]. The alleged rule bars even a gentle request for a moderated voice. So when plaintiff asked, "not quite so loud?" — and received a cheerful "sorry" — he was told by Robinson, the library Director, that such communication had to "go through staff." Expressly justified by fear of sensitive reactions, the rule is a "heckler's veto," a presumptively invalid content regulation that is not necessary to prevent serious disruption and so violates the California and United States constitutions. In the First and Second claims for relief, plaintiff asks the court to declare the "policy" invalid, and to enjoin its further application.

The ban on unchaperoned speech is only the start of the IGS assault on individual rights. Any attempt to question the policy sparks vindictive retaliation. Thus when plaintiff asked if such a rule had actually been promulgated, Robinson refused to answer. Surprised that a polite request such as the one made could be a problem, plaintiff tried to ask Robinson if the rule was aimed solely at him. Before he could finish, Robinson summarily ejected him from the library [A.C. ¶14]. The ejection was a reprisal for the attempt to question a novel restriction on speech, and thus a violation of both 42 U.S.C. § 1983 and Cal. Civil Code § 52.1 (the Bane Act), which provides a remedy for coercive "interference" with constitutional rights. Because the right to speak to officials about public policy is well-established, Robinson is not entitled to qualified immunity for depriving plaintiff of his privilege to use the library.

Summary exclusions are limited to 7 days, so after staying away for one week, plaintiff returned to the library. Though he was there as a matter of right (and was not asked to leave), Robinson reported that he was "trespassing," causing the police to detain him for investigation, and to arrest him on discovery of an (erroneously issued) bench warrant. Because he was privileged by statute to return to the library, plaintiff could not have been trespassing. In making the false report, Robinson was again retaliating for plaintiff's speech, having felt "abused" the week before when plaintiff said he would sue [Ex. 8]. Investigative detention is a well-known

1

liberty deprivation, and its fraudulent instigation was a second violation of both § 1983 and the Bane Act. The constitutional right to freedom from unjustified physical seizure was well-established, and so here again Robinson is not entitled to qualified immunity.

§ 1983 and the Bane Act were violated a third time when plaintiff was excluded from the library between July 23 and October 3, 2007, after the detention but before IGS invited him to return if he held his tongue about "quiet and the like" [Ex. 8]. Since Robinson had already retaliated twice, in this period plaintiff obviously could not risk another return to the library because Robinson and his staff might make another phony trespass report and trigger another unlawful detention.

ISSUES PRESENTED

1.     May IGS be sued directly under FRCP 17(b) as an unincorporated association?

2.     Has plaintiff adequately alleged that the library ban on inter-patron speech violates the California constitution and/or the First Amendment?

3.     Has plaintiff adequately alleged deprivations in retaliation for constitutionally protected expression, in violation of § 1983?

4.     Was plaintiff's right to speak as he did well-established, precluding qualified immunity for Robinson?

5.     Has plaintiff adequately alleged unprivileged acts of interference with constitutional rights under the California Bane Act?

ARGUMENT<br>I.

**IGS HAS CAPACITY FOR SUIT AS AN UNINCORPORATED ASSOCIATION AND THE REGENTS ARE NOT A PARTY TO THE ACTION**

The Regents have no role in this action. Because the Institute of Governmental Studies is financially self-sufficient and its library is independent of the campus system, it has capacity as an "unincorporated association" and may be sued in its own name in federal court under FRCP 17(b)(3) and/or 17(b)(3)(A). Since the Regents need not be a defendant, the action is not against an "arm of the state" with Eleventh Amendment immunity, and there is no jurisdictional bar. For

2

the same reason, it is irrelevant whether the Regents are a "person" under § 1983 or the Bane Act. Nothing in *Campbell v. Regents of University of California*, 35 Cal.4th 311 (2005), requires plaintiff to sue the Regents rather than IGS. That case states only that the Regents have authority to place an administrative exhaustion requirement in an employee handbook. The court held that despite being a state constitutional entity, the Regents are "not entirely autonomous" and are subject to legislation addressing "... matters of statewide concern not involving internal university affairs ..." 35 Cal.4th at 321. Since general capacity rules are matters of statewide concern and do not affect internal university affairs, the Regents cannot sidestep the fact that IGS has capacity to defend in its own name.

The following facts establish IGS as an unincorporated association with capacity for suit: [1]

- IGS has a common mission. [Ex. 1];
- The IGS mission is directed by a National Advisory Council composed entirely of private entities. [Ex. 2];
- IGS is only 24% funded by the Regents. [Ex. 3];
- IGS has an income-generating capacity and an endowment of $5.7 million. [Ex. 4];
- IGS has nine active "research projects," all privately financed. [Ex. 5];
- The IGS Library is independent of the campus library system. [Ex. 6].

Capacity Under California Law

Under Rule 17(b)(3), the law of the state in which the forum sits determines capacity for suit. In California, unincorporated associations have long had legal capacity for all purposes. 4 Witkin, *California Procedure* §84, at p. 141. The definition of unincorporated association is "liberal." *Johnson v. Chilcott*, 599 F.Supp. 224, 230 (D.Colo. 1984). In California, "[t]he criteria applied to determine whether an entity is an unincorporated association are no more complicated than (1) a group whose members share a **common purpose**, and (2) who function under a common name under circumstances where **fairness** requires the group be recognized as a

---

[1] Defendants append extrinsic evidence in the form of web-page excerpts, and so plaintiff does so as well. If necessary to permit their consideration, plaintiff asks the court to convert the motion to one for summary judgment.

3

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

legal entity." *Barr v. United Methodist Church*, 90 Cal. App.3d 259, 266 (1979). Such "[f]airness includes those situations where persons dealing with the association contend their legal rights have been violated," and to that end "[f]ormalities of quasi-corporate organization are not required." *Id.*, 90 Cal. App.3d at 266-267. The rule exists as a convenience for plaintiffs, and is available so long as the entity sued is more than a mere label. *Johnson v. Chilcott*, supra, 599 F. Supp. at 221.

The IGS mission is to "serve as a bridge between academia and the intersection of politics, policy and the media," [Ex. 1], a mission directed by a private advisory Board ("distinguished individuals representing the corporate ... etc.") [Ex. 2]. Under *Barr*, these facts make it "fair" to require IGS to defend in its own name, and it is irrelevant that, e.g., its Director is appointed under general campus procedures or that its activities might be "complementary to academic goals." And since the IGS library, locus of the dispute, is independent of the university system [Ex. 6], a grant of the requested relief would have no effect on the university at-large.

Capacity Under Federal Law

Rule 17(b)(3)(A) permits suit against an unincorporated association, even when state law does not, where the action, as here, seeks to enforce a "substantive right existing under the laws of the United States." Federal courts define "unincorporated association" by their own test, and state law is irrelevant. *Sierra Ass'n for Environment v. F.E.R.C*, 744 F.2d 661, 662 (9th Cir. 1984). Beyond the inquiry into "common enterprise or objective," the federal test focuses on the entity's ability to pay a judgment. *E.E.O.C. v. St. Francis Xavier Parochial School*, 77 F.Supp.2d 71, 77 (D.D.C. 1999). In *E.E.O.C.*, a Parish that did not possess separate assets with which to satisfy a judgment was found to be a mere division of its incorporated parent, the Archdiocese, not an "unincorporated association." 77 F.Supp.2d at 76. The Archdiocese exerted "varying degrees of control over different aspects of the Parish's operations," and had to approve any expenditure over $10,000. Under *EEOC*, it is immaterial that IGS retains some vestigial connection with the Regents. The key fact is that IGS is self-sustaining, and controls assets available to satisfy a judgment.

4

Similarly distinguishable is *Kivalina Relocation v. Teck Cominco Alaska*, 227 F.R.D. 523 (D. Alaska 2004). A citizen advisory group ("KRPC"), appointed by local governing bodies, was found not to be an "unincorporated association" because all authority was retained by the appointing entities. As to these individuals the court noted:

> They do not: determine who may serve on KRPC, do not finance the functions or scope of authority of KRPC, do not control the continued existence of KRPC, nor do they bear the ultimate responsibility for the acts or actions of KRPC. All of these powers and attributes are retained by the Borough, City and/or Village.

227 F.R.D. at 527. By contrast, IGS appears to be substantially independent of the Regents. It is 76% privately financed [Ex. 3], has a National Advisory Council composed entirely of private entities, generates income from its own (chiefly publishing) operations, and has a private endowment of $5.7 million. In the face of these facts, it is immaterial that the IGS Director is a tenured faculty member or that his appointment results from procedures employed elsewhere in the university. Since IGS is not an operating governmental unit, it is not exempted from classification as an unincorporated association. Cf. *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992)[sheriff's department]; *Duarte v. City of Nampa*, 2007 U.S. Dist. LEXIS 19900 at *8-9 (D. Id. 2007)[police department].

In what appears to be the first treatment of the issue anywhere, the Tenth Circuit has held that unincorporated associations are not § 1983 "persons." *Lippoldt v. Cole*, 468 F.3d 1204 (10th Cir. 2006). The court reasoned that Congress could not have intended to include unincorporated associations because they were not "generally" recognized as legal entities when the Civil Rights Act of 1871 was enacted. However, the court should decline to follow *Lippoldt*, because the Supreme Court has discounted history as a guide to interpreting § 1983.

In his concurring opinion in *Crawford-El v. Britton*, 93 F.3d 813, 830-32 (D.C. Cir. 1996), vac. other grounds, 523 U.S. 574 (1998), Judge Silberman explained that for the first ninety years of the Act, federal courts saw it as applicable only to the Reconstruction-era "Black Codes," not to private torts. Then, in *Monroe v. Pape*, 365 U.S. 167 (1961)], the Supreme Court greatly expanded the substantive grounds for suit under the statute and, "**turned § 1983 into a provision that the post-civil war Congress could not possibly have visualized.**"

5

The point to bear in mind, then, … is that the causes of action that largely create the problem that qualified immunity addresses were not created by Congress; they were devised by the Supreme Court without any legislative or constitutional (in the sense of positive law) guidance.

See also, *Hepting v. AT& T Corp.*, 439 F.Supp.2d 974, 1009 (N.D. Cal. 2006).

In other words, § 1983 now remedies conduct such as retaliation against free speech precisely because the *Monroe* Court ignored "legislative intent." If the "intent" of 1866 no longer controls the statute's substantive reach, why would it limit the range of responsible entities? Since 1872 in California, C.C.P. § 388 (now § 396.5) has accorded unincorporated associations full recognition as legal entities. *See gen.*, 4 Witkin, California Procedure §84, at p. 141. Soon after, it was decided that such recognition also extends to associations whose activities are not primarily commercial, such as IGS. *Herald v. Glendale Lodge No. 1289, Benevolent & Protective Order of Elks*, (1920) 46 Cal.App. 325.

In sum, since IGS can pay any likely judgment without resort to the university or state treasuries, it is fair to require it to defend in its own name as an "unincorporated association." Since the Regents are not a party, there is no jurisdictional obstacle under the Eleventh Amendment and it is irrelevant whether the Regents are a "person."

## II.

### THE FLAT BAN ON SPEECH ABOUT QUIET IS AN INVALID CONTENT REGULATION

Attempting to justify a (likely fictitious) rule barring inter-patron speech about quiet, defendants assert:

**"[E]ngaging other patrons directly — could lead to disputes and disruption."**
[Motion to Dismiss, p. 6, lines 11-12.]

The perceived "harm" of such engagement is at best speculative, as shown by the ready assent produced by plaintiff's mild request for (relative) quiet. [A.C. ¶13.] "Under properly applied first amendment standards, the harm's abstractness should actually aid free speech interests because the burden would always be on the government to demonstrate the existence of significant danger from the expression, not on the speaker to prove the opposite."

6

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

Tribe, <u>Constitutional Choices</u>, 204-07 (1985). Defendants pretend the alleged rule is needed to "enforce silence," but silence is almost unknown in the IGS library, the prevailing atmosphere being one of modified quiet punctuated by exhibitions of policy expertise by IGS staff. [A.C. ¶12.] What the "policy" really does is invest librarians with exclusive title to speech about quiet, a result that accords with the IGS ideal of "big government" [A.C. ¶12], but is incompatible with any recognized notion of free speech. The regulation imposes an unconstitutional "heckler's veto."

<u>The Regulation Is Invalid Under The California Constitution</u>

Where state law provides independent support for a plaintiff's free speech claims, a federal court should look to it before deciding the issue under the First Amendment. *Kuba v. 1-A Agricultural Association*, 387 F.3d 850, 856 (9th Cir. 2004). The "Liberty of Speech" clause of the California Constitution, Article I, § 2(a), reads:

> **"Every person may freely speak**, write and publish **his or her sentiments on all subjects**, being responsible for the abuse of this right. **A law may not restrain or abridge liberty of speech** or press." [emphasis supplied]

The right to freedom of speech under Article I is "broader and greater" than that under the First Amendment. *Fashion Valley Mall, LLC v. National Labor Relations Bd.*, (2007) 42 Cal.4th 850, 862-863. In California the "public forum" doctrine "**is not limited to traditional public forums** such as streets .. [etc]." Instead, speech is beyond suppression so long as it is "basically compatible" with a venue's "normal activity." *Kuba, ,* 387 F.3d at 857. Since in the IGS library conversation is not infrequent, a polite request for a lowered voice cannot be "incompatible." All material allegations, and reasonable inferences therefrom, must be taken as true. *Pareto v. F.D.I.C.*, 139 F.3d 139 F.3d 696, 699 (9th Cir. 1998). Moreover, in the context of a public campus, incompatibility means a "physical or forcible interference" with normal activities. *Braxton v. Municipal Court*, 10 Cal.3d 138, 150 (1973). Under Article I, a library patron on the Berkeley campus is at least presumptively entitled to courteously ask for a lowered voice even if a hostile reaction might result. If such a reaction does occur, library officials are limited to calming or ejecting the sensitive listener.

7

Because Article I affirmatively permits all speech not "basically incompatible" with a forum, the "reasonableness" test applied in *Kreimer v. Bureau of Police*, 958 F.2d 1242 (3rd Cir. 1992) obviously does not apply here. That case involved library rules against offensive hygiene and other <u>non-expressive conduct</u> causing "annoyance," such as staring or stalking. The library there was treated as a "limited public forum," and its rules as "manner" regulations (*Id.* at 1246), because there was no contention that they restricted expressive content (*Id.* at 1262). But a restriction must be content-neutral to be a "time, place, or manner" regulation, and a rule based on expected listener reaction ("disputes") is not content-neutral. *Fashion Valley Mall, supra,* 42 Cal.4th at 868. Even if the IGS policy were a TPM regulation, in California it would be would be tested under "intermediate scrutiny," requiring "narrow tailoring" to achieve a "significant" government interest. *Los Angeles Alliance For Survival v. City of Los Angeles*, (2000) 22 Cal.4th 352, 364. A rule banning even courteous speech about quiet isn't even reasonable, essentially repealing adulthood, but it definitely is not "tailored."

Under Article I, the applicable case is *Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719 (C.D. Cal. 1996), where the court preliminarily enjoined a school board rule barring public criticism of school employees on the ground that it might be defamatory. Assuming that defamation might sometimes result, the court found the prospect insufficient, describing the rule as "censorship." The court held that under Article I, even where the venue is only a "limited public forum," a content-based regulation of speech that is relevant to the business at hand is enforceable only where it is "necessary to serve a compelling state interest." 936 F.Supp. at 730. The IGS rule, prohibiting what could be considered an implicit form of public criticism, fails under *Baca* because it targets a "harm" that is essentially fictitious. In *Baca* the prospect of damage to reputations was at least real, while here the claim is that users of the library are at the same time future leaders, and tender daffodils, too unstable to handle a request for a lowered voice. Of course, if speech about quiet had ever sparked serious conflict, IGS would have included the "policy" in its detailed library Code of Conduct [Ex. 7].

8

1    The Regulation Is Invalid Under The First Amendment

2    Direct regulation of speech generally must be supported by a compelling governmental

3  interest and be narrowly tailored to serve that interest. *Regan v. Taxation With Representation,*

4  461 U.S. 540, 546 (1983). Therefore under the First Amendment as well, it is improper to test

5  the IGS policy under the "reasonableness" standard used in *Kreimer.* The library rules in

6  *Kreimer* were seen as "manner" regulations that did not burden content, whereas here the alleged

7  policy is a direct content restriction expressly justified by reference to listener reaction, meaning

8  it cannot be a "time, place or manner" regulation. A restriction on speech is a TPM regulation

9  only if it is <u>content-neutral</u>. *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989), and

10  "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v.*

11  *Nationalist Movement,* 505 U.S. 123, 134 (1992). Content regulations are presumptively

12  unconstitutional. *S.O.C., Inc. v. County of Clark,* 152 F.3d 1136, 1145 (9th Cir. 1998). In the

13  school context, the applicable First Amendment authority is *Tinker v. Des Moines Independent*

14  *Community School Dist.,* 393 U.S. 503, 508 (1969). Under *Tinker,* "[U]ndifferentiated fear or

15  apprehension of disturbance is not enough to overcome the right to freedom of expression," yet

16  that is exactly what defendants ask the court to approve here.

17    Even under a "reasonableness" test applied to a limited public forum, there must be

18  "evidence that the restriction reasonably <u>fulfills a legitimate need</u>." *Sammartano v. First*

19  *Judicial District Court,* 303 F.3d 959, 967 (9th Cir. 2002)[emphasis supplied]. In *Sammartano,*

20  which involved a rule that prohibited the wearing of clothing bearing motorcycle club insignia in

21  a courthouse, the court reversed the denial of a preliminary injunction because the record

22  "simply did not show that the asserted risks [intimidation] were real." *Id.* at 967. The restriction

23  could not be "rendered constitutional" by the expedient of merely presuming the subject clothing

24  might "incite problems." *Id.* at 969.

25    Obviously, here defendants indulge in the same kind of presumption about "problems"

26  that was found wanting in *Sammartano.* First, a request for a moderated voice is not itself a

27  violation of "silence," since in the IGS library the presence of conversation is not unusual. [A.C.

28  ¶12.] All material allegations must be taken as true. *Pareto, supra,* 139 F.3d at 699. As in

9

*Sammartano*, the "asserted risk" is not real. Even in a traditional library, a mild request such as the one plaintiff made does not threaten anything. But here, plaintiff's request produced only ready agreement, not rancor. Even if more sensitive reactions might occur, the sacrifice of free speech to that possibility is a "heckler's veto," which is unconstitutional. *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

In sum, free speech doctrine has no "library exception." Under *Baca* and *Sammartano*, the library "policy" fails in the absence of a substantial history of material disruption resulting from mere quiet requests. Plaintiff has already suffered irreparable injury in the form of ten months' lost use of the library, and is therefore entitled to an immediate preliminary injunction against the unwritten and likely fictitious "policy," as well as the tandem policy of punishing any attempt to speak to IGS staff.

## III.

## THE DAMAGE CLAIMS AGAINST ROBINSON ARE ADEQUATELY PLEADED

In evaluating the damage claims against Robinson, argument about the validity of the alleged speech policy itself is misplaced. The retaliation/interference claims are not founded upon, and are wholly independent of, the status of the alleged library policy. Liability for retaliation against the attempt to question a public official exists even if the supposed regulation somehow survives attack.

A.    The Library Ejection Was A Reprisal For Protected Speech

The Amended Complaint satisfies the two essential elements of a claim under § 1983: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that such conduct caused deprivation of a right, privilege or immunity secured by the Constitution. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473 (1961). It is irrelevant that the benefit affected, library use, may not be a vested property right. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 903 (9th Cir. 2007). The pleading also satisfies the requirements of the Bane Act, alleging that Robinson effected the ejection through the "intimidation" of a threat of forcible removal by the police.

10

1   It is alleged that when Robinson invoked the policy against direct speech about quiet: (1)

2   plaintiff suggested discussing the matter outside; (2) Robinson insisted on staying in the library;

3   (3) the library was empty but for staff when plaintiff was speaking; (4) plaintiff asked whether a

4   policy against inter-patron speech actually existed, and (5) plaintiff tried to ask if the "policy"

5   actually was personal, but before he could finish Robinson ordered him to leave the library "or

6   the police will be called." [A.C. ¶14]. The library ejection was an unlawful reprisal for exercise

7   of constitutionally protected speech rights, because Robinson was not entitled to simply insulate

8   himself from citizen address.

9       In *Glair v. City of Los Angeles*, 2008 U.S.Dist. (C.D. Cal.) [LX 24519], the court held that

10  plaintiff stated claims under § 1983 and the Bane Act when he alleged that he was arrested for

11  "stalking" a city employee after reporting that the employee seldom showed up for work. The

12  court stated that because there were no facts indicating a "true threat," plaintiff's complaints

13  about job performance "qualified as protected speech under the First Amendment," since "as a

14  general proposition … **mere criticism of a public official is protected free speech …**" [citing

15  *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)]. The *Glair* analysis applies here, where in

16  trying to ask Robinson if invocation of the "policy" was personally motivated, plaintiff never

17  said anything remotely resembling a threat.

18      Under the California constitution, every person may "freely speak" his sentiments on all

19  subjects. University officials have even less discretion than do other public officials to suppress

20  or punish speech. Under Penal Code § 626.6, speech on a public campus may not be prohibited

21  unless it threatens to "interfere with the peaceful conduct" of campus activities, and this means

22  actual physical disruption. *Braxton, supra*, 10 Cal. 3d at 150. Even if brief criticism of a rule

23  could be "disruptive," the library was empty at the time [A.C. ¶13], and Robinson was always

24  free to walk away. Plaintiff did not insult Robinson ("son-of-a-bitch") until after the ejection

25  [A.C. ¶14], but in any event school officials must withstand "robust rhetoric" on matters

26  "arguably political." *Chandler v. McMinnville School Dist.*, 978 F.2d 524, 531 (9th Cir. 1992)

27  ["scab" buttons possibly insulting to temporary teachers not inherently disruptive]. Such

28  matters need not rise to the level of a "public concern." *Pinard v. Clatskanie School Dist. 6J,*

11

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

446 F.3d 964 (9th Cir. 2006). Moreover, since plaintiff had no previous notice of the putative rule, he was never actually in violation. All material allegations must be taken as true. *Pareto v. F.D.I.C.*, supra 139 F.3d at 699. If Robinson did not wish to engage with plaintiff, his remedy was to return to his office.

Unable to deny plaintiff's right to question Robinson about policy, defendants resort to challenging the propriety of the <u>location</u>, asserting:

> "... **the quiet of the reading room is not a proper place for patrons to argue with staff over library policies.**"
> (Pts. & Auth. I.S.O. Defendants' Motion to Dismiss, p. 6, lines 13-14.)

However, plaintiff has alleged that the library was bereft of patrons at the time [A.C. ¶13], and that he suggested going outside while <u>Robinson insisted on staying in the library</u> [A.C. 14]. Even if there was any authority for defendants' novel theory about proper arguing venue, the retaliation claim for the initial library ejection stands untouched.

B.    <u>The Instigation of Police Detention Was A Reprisal For Protected Speech</u>

Plaintiff has alleged that when he returned to the library a week after being ejected, he was detained by police because Robinson reported him as a trespasser [A.C. ¶17], and that Robinson knew there was no trespass and made the false report to retaliate for plaintiff's speech the week before [A.C. ¶33]. These allegations state a claim under both § 1983 and the Bane Act.

A police investigative detention, or "Terry stop" [*Terry v. Ohio,* 398 U.S. 1 (1968)], is a "seizure." *United States v. Mendenhall,* 446 U.S. 544, 552 (1980). Where not supported by "reasonable suspicion," such a detention is a Fourth Amendment liberty deprivation. It is not required that the defendant effect the deprivation himself, only that he instigate it. *Bomar v. Keyes,* 162 F.2d 136 (2d Cir. 1947); cert. den. 332 U.S. 825 (1947) [principal instigated school board's firing of probationary school teacher]; *Brandhove v. Tenney,* 183 F.2d 121 (9th Cir. 1950) [members of senate investigating committee induced prosecution of misdemeanor as reprisal for refusal to answer questions]. The police report shows that Robinson was responding to plaintiff's speech the week before [Ex. 8]. Thus Robinson can evade liability only if his report of trespassing was somehow "reasonable."

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

That report was objectively unreasonable, because In California, Penal Code §626.6 limits summary campus exclusions to a maximum of 7 days absent special notice. So after staying away from the library for one week, plaintiff was privileged to return <u>as a matter of right</u> and was a non-trespasser as a matter of law. The detention was therefore also unreasonable from the perspective of both Robinson and the officers (who were told the ejection had taken place "about two weeks" before).[2] Reporting a crime that could not have occurred is at least "reckless," and that is all that is required under § 1983. *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). It does not matter that Robinson felt plaintiff had been "abusive" the week before. Criticism of public officials not amounting to a "true threat" is protected speech. *Glair, supra*; *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990)["abrasive" conduct does not justify a police stop unless some specific crime has been committed]. The same goes for a promise to sue. *City of Long Beach v. Bozek*, (1982) 31 Cal. 3d 527, 535.

C.     The "Class of One" Equal Protection Claim is Proper

Contrary to defendants' assertion, a "class of one" equal protection claim does not require an allegation of membership in a "protected classification." The very authority defendants cite, *Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), holds that such a claim properly lies where plaintiff does **not** allege membership in such a class, but does allege that without rational basis he was intentionally treated differently from others similarly situated. 528 U.S. at 564. In *Willowbrook*, a village required a 15-foot easement from other property owners, as the price of connecting property to the municipal water supply, but a 33-foot easement from the plaintiffs, perhaps out of spite. Here, as to the "policy" against direct quiet requests, plaintiff satisfies *Willowbrook* by alleging that "no such rule has ever been invoked against any person other than plaintiff," i.e. that the rule is not applied to other library users whose interest in quiet is no different from his.

---

[2] An unlawful detention is not cured by subsequent discovery of a bench warrant. *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005).          13

This is also a sufficient allegation of "similarly situated." All a plaintiff need do is allege

he was treated differently from "individuals who are prima facie identical in all relevant respects,

and that the cause of the differential treatment is a totally illegitimate animus ..." *Jones v. City

of Modesto*, 408 F.Supp.2d 935, 957 (E.D. Cal. 2005). Thus in *Martinson v. Menifee*, 2007

U.S.Dist. [LX 52591], it was sufficient for a prisoner to allege that he was the only one in a

Secure Holding Unit whose eyeglasses were confiscated. Here, plaintiff's status as a non-student

obviously cannot be "relevant" under *Jones* because the library is officially open to all-comers.

If IGS cannot show that the "policy" has any actual history of application, a jury can reasonably

attribute its appearance here to personal animus.

Even before *Willowbrook*, it was basic equal protection doctrine that the "compelling

interest" test is applied when official action impinges upon exercise of a fundamental right, such

as speech. *Plyler v. Doe*, 457 U.S. 202, 216-217 (1982). But even assuming, *arguendo*, that a

"rationality" test applies, that inquiry goes to the <u>differential application</u> of the regulation, not to

its substantive merits. Defendants offer no explanation as to why achievement of any library

objective requires barring only plaintiff from asking for quiet, not anyone else. The authorities

cited by defendants are wildly off point. *Faith Center Church Evangelistic v. Glover*, 480 F.3d

891, 910 (9th Cir. 2007) is not an equal protection case. Neither is *Souders v. Lucero*, 196 F.3d

1040 (9th Cir. 1999), whose rule is that a campus' generally "open" nature does not trump a

criminal protective order issued after multiple incidents of stalking. Plaintiff was always a

peaceful and compliant user of the IGS library. [A.C. ¶12.] In *Freeman v. City of Santa Ana*, 68

F.3d 1176 (9th Cir. 1995), the subject dance permit was denied by reference to an actually

promulgated standard, i.e. the bar's location in a "high-crime" area. By contrast, here the finding

of disparate treatment follows precisely from the fact that the alleged "policy" does not really

exist. *Julian-Bey v. Crowley*, an unreported case, involves prisoners, whose speech interests are

truncated in a way that plaintiff's are not.

Finally, one would think the Amended Complaint fairly screams intentionality. If

necessary, plaintiff will amend to clarify that the differential treatment was "intentional."

---

14

**IV.**

**ROBINSON IS NOT ENTITLED TO QUALIFIED IMMUNITY**

While defendants claim that a library is entitled to enforce its rules "selectively," and that the right to speak to others in a public library is not clearly established, those assertions relate to the substance of the IGS "policy," not to the right to safely inquire about it. The validity of the alleged rule is irrelevant to the issue of whether Robinson violated established law in ejecting plaintiff for attempting to question that rule. An official's claim of qualified immunity will be defeated if, "in light of pre-existing law," the unlawfulness of his conduct was "apparent." *Grossman v. City of Portland*, 33 F.3d 1200, 1208 (9th Cir. 1994). In July, 2007, it was "apparent" that (1) plaintiff was entitled to question Robinson in the library, and (2) plaintiff was entitled to return to the library after a 7-day ejection irrespective of Robinson's approval.

_The Library Ejection_

In a room that was empty but for plaintiff and IGS staff [A.C. 13], plaintiff calmly asked if the "policy" really existed, then tried to ask if something personal might be afoot. [A.C. 14.] Plaintiff had suggested speaking outside the library, while it was Robinson who insisted on remaining inside. [Id.]  Since America long ago decided to dispense with kings, the mystery is how Robinson saw himself as simply beyond address. Ejecting plaintiff merely for asking a few questions was beyond Robinson's authority.

The California constitution entitled plaintiff to **"freely speak"** his **"sentiments on all subjects,"** while under Penal Code § 626.6, speech is not a basis for ejection unless it threatens to "interfere with the peaceful conduct" of activities, which means a "physical or forcible interference." *Braxton, supra,* 10 Cal. 3d at 150. School officials must withstand "robust rhetoric" on matters "arguably political." *Chandler, supra,* 978 F.2d at 531, and such discussion need not rise to the level of a "public concern." *Pinard, supra,* 446 F.3d at 973. Nothing plaintiff said before ejection (or after) even approached the "material disruption" standard. In any event, it was apparent that plaintiff was entitled to remain in the library because "mere criticism of a public official is protected free speech." *Glair, supra,* [citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)]. Plaintiff called Robinson a "son-of-a-bitch" after being

15

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

ejected, not before [A.C. ¶14], but even "manifest disrespect" for authority is not enough to overcome clearly established free speech principles, and government officials "may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity." *Duran v. City of Douglas*, supra, 904 F.2d at 1378 [qualified immunity denied, and summary judgment granted for plaintiff on §1983 claim, where police detained and arrested plaintiff solely for profanity relating to prior ejection from a bar]. The *Duran* rule covers librarians too.

Defendants' citation to *Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985) is inapposite. In that case, qualified immunity for the Attorney General was appropriate because the conduct at issue, a warrantless wiretap, was not declared unlawful until one year after the subject incident. 472 U.S. at 530.

Instigation of Detention

Qualified immunity is unavailable where a report is in reckless disregard of the truth and is material to an erroneous legal determination. *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995)[false statements in search warrant]. It is undisputed that the sole cause of plaintiff's detention was Robinson's report of "trespassing." That report was at least recklessly false because under Penal Code §626.6 a summary exclusion may not exceed 7 days, meaning plaintiff was obviously entitled to return to the library after staying away for one week. The statute exists to prevent the use of trespassing laws to accomplish an "end run" around constitutional protections for speech. *See, Braxton, supra*, 10 Cal. 3d at 150 [construing nearly identical companion statute]. Even though he is not U.C. Berkeley's "chief administrator officer," Robinson was bound by the statute because it also applies to designees, and if Robinson was not a designee, then even the original ejection was unlawful, let alone the attempt to make it permanent.

Plaintiff's re-appearance in the library was an obvious non-trespass even without considering the statute, because Robinson never told plaintiff how long his ejection was to last [A.C. ¶15]. In California, all varieties of trespassing require the ignoring of valid notice. Since plaintiff had been given no notice of the duration of his ejection, there was no ground on which

16

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

1  to consider him a trespasser merely for re-appearing after one week.

2      Exhibit 8 shows that Robinson reported plaintiff as a "trespasser" because he was miffed at

3  plaintiff's speech the week before, particularly his promise to sue.  But plaintiff is only required

4  to show the "well-established" nature of the right violated (Fourth Amendment liberty) not the

5  speech that motivated the retaliation.  Nevertheless, it remains true that the promise to sue was

6  absolutely privileged, *City of Long Beach, supra,* 31 Cal. 3d at 535, as was the post-ejection

7  epithet "son-of-a-bitch." [A.C. 14.]  Government officials "may not exercise their authority for

8  personal motives, particularly in response to real or perceived slights to their dignity." *Duran v.*

9  *City of Douglas,* supra, 904 F.2d at 1378 [qualified immunity denied where police detained and

10  arrested plaintiff solely for profanity relating to prior ejection from bar].

11                                        V.

12                    **PLAINTIFF HAS PROPERLY STATED**
13                    **THREE VIOLATIONS OF THE BANE ACT**

14      The Bane Act (Cal. Civil Code § 52.1) provides a civil remedy for persons whose

15  exercise of constitutional rights has been interfered with by "threats, intimidation or coercion."

16  Plaintiff alleges coercive interference with his speech rights when (1) he was ejected from the

17  library for daring to question the basis for a novel speech restriction, (2) he was detained on the

18  strength of a fraudulent report of crime made as a reprisal for such questioning and/or his

19  promise to sue over the ejection, and (3) when the library exclusion was extended beyond July

20  23, 2007, even though plaintiff was entitled by statute to return, by the threat of additional false

21  crime reports and consequent police detentions.  Each of these deprivations was a violation of the

22  Bane Act because each was each was effected through the intimidation represented by actual or

23  threatened use of the police, and each was aimed at punishing or squelching plaintiff's protected

24  speech about arbitrary library rules.

25      Defendants' objections are meritless.  First, there is no requirement of a "hate crime."

26  This was made plain in *Venegas v. County of Los Angeles,* 32 Cal. 4th 820, 843 (2004), where the

27  court stated that although previously it noted that the impetus for the Bane Act was a wave of

28  hate crimes [*Jones v. Kmart Corp.,* (1998) 17 Cal.4th 329, 338], that statement "**did not suggest**

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

that section 52.1 was limited to such crimes ..." Defendants gain nothing from *Austin B. v. Escondido Union Sch'l Dist.*, 149 Cal.App.4th 860 (2007). In that case the issue was causation, not adequacy of pleading. A nonsuit was affirmed for lack of proof that defendant's conduct actually caused the minor plaintiffs to avoid school.

There is also no requirement of physical touching or "violence." The constitutional interference need only be accompanied by a **form of coercion.** *Jones v. Kmart Corp.*, supra, 17 Cal. 4th at 334; *O'Toole v. Superior Court*, 140 Cal.App.4th 488, 502 [noting "broad scope" of 'coercion' etc. requirement]; *City and County of San Francisco v. Ballard*, 136 Cal.App.4th 381, 408 (2006). Again, *Austin B.*, *supra,* is not to the contrary. That case discussed physical touching only in connection with common law battery, not the Bane Act. 149 Cal.App.4th at 871, et. seq. In *Rabkin v. Dean*, 856 F.Supp. 543, 552 (N.D. Cal. 1994), the court noted that no California court had yet interpreted the Bane Act, and so assumed a requirement of a "threat of violence." But that was before *Jones* and *O'Toole*. The *Rabkin* court simply guessed wrong.

It is no obstacle that subdivision (j) of the Act excepts "speech alone" that does not threaten violence, because the use of words to effect a deprivation is not "speech alone." Thus in *O'Toole, supra*, police officers ordered non-student demonstrators to leave campus for lack of a permit, a condition ultimately held unconstitutional. Before applying state immunity for good faith belief in the validity of the permit requirement, the court stated:

> We assume ... that the officers' **conduct in demanding that plaintiffs leave** campus and arresting O'Toole after he refused to discontinue his activities **constituted 'coercion'** within the meaning of Civil Code section 52.1, subd. (a).

140 Cal.App.4th at 542 [emphasis supplied].

Thus, a verbal demand to leave by an official with apparent authority is <u>conduct</u>. This is well-established in the civil rights context. In *Long v. Valentino*, 216 Cal.App.3d 1287 (1989), an action under the Unruh Civil Rights Act, a lawyer "caused" the discriminatory ejection of a police officer from a public meeting simply by ordering him to leave. It was "immaterial" that this was accomplished by words alone. 216 Cal.App.3d at 1297. "Informal measures, such as 'the threat of invoking legal sanctions and other means of coercion, persuasion, and

18

intimidation,' can violate the First Amendment also." *White v. Lee,* 227 F.3d 1214, 1228 (9th Cir. 2000) [agency investigation of neighbors who opposed motel conversion]. Under *O'Toole, Long,* and *White,* it was coercive conduct, not "speech alone," when Robinson used a threat of removal by the police to force plaintiff from the library, and when he made a phony trespass report to cause plaintiff's detention.

Causing plaintiff to be detained for investigation was "coercive" because a detention is a "seizure," *United States v. Mendenhall, supra,* 446 U.S. at 553-54. The essential condition of such a seizure is satisfied in that plaintiff was prevented from leaving [A.C. 17]. Contrary to the assertion in the Reply, the detention, as distinguished from the ensuing arrest, was indeed unlawful. When the officers arrived, they knew the reported conduct was necessarily non-criminal, because the alleged trespass was plaintiff's mere reappearance in the library after an ejection "about two weeks" before [Ex. 8], and such an exclusion cannot exceed 7 days (Penal Code § 626.6). A lawful detention requires "reasonable" suspicion" of criminal activity, but suspicion based on a mistake about whether the subject conduct is proscribed is not reasonable because it is not objectively grounded. *People v. White,* (2003) 107 Cal.App.4th 636, 643 [citing *U.S. v. Lopez-Soto,* 205 F.3d 1101, 1106 (9th Cir. 2000)]. Moreover, an unlawful detention cannot be "supported" (Reply, p. 9) by an outstanding warrant. It was only because of the detention that the officers learned of the warrant. Discovery of a warrant does not retroactively justify the detention. *Moreno v. Baca,* 431 F.3d 633, 641 (9th Cir. 2005).

Finally, Robinson excluded plaintiff from the library at least between July 23 and October 3, when IGS told plaintiff he could return if he held his tongue about "quiet and the like" [A.C. ¶18]. As of July 23, Robinson had already retaliated twice merely because plaintiff dared to speak to him, and had shown contempt both for the "actual physical disruption" standard (*Braxton, supra,* 10 Cal. 3d 150), and for the 7-day exclusion limit in Penal Code §626.6. In view of this lawlessness, plaintiff obviously could not risk another return to the library after July 23, since the vindictive Robinson might make another phony trespass report, triggering another unlawful detention unsupported by "reasonable suspicion." That threat alone was a "form of coercion" under *Jones* and *O'Toole, supra.* "A ... regulation may work a violation of the

19

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

1   Fourth Amendment where the complainant "will likely be subjected to further seizures by the

2   police in the future ..." *Kolender v. Lawson*, 461 U.S. 352, 363, fn. 1 (1983) (Brennan concur.)

3   Whether a person justifiably fears returning to a venue controlled by vindictive officials willing

4   to report non-existent crimes is obviously a jury question not resolvable on a motion to dismiss.

5       Civil Code Section 47(b) Does Not Apply

6       Civil Code §47(b), the "reporting privilege," does not apply to the July 16 ejection because

7   that act was not a "communication" relating to a judicial or quasi-judicial proceeding. It is only

8   the second and third acts of "interference," the instigation of plaintiff's detention by fraud, and

9   the resulting extended deprivation of library use, to which the privilege could potentially apply.

10      Defendants cite *Hagberg v. California Federal Bank*, 32 Cal.4th 350 (2004) for the

11  proposition that the privilege applies to Robinson's bad faith trespass report. But in *Hagberg* the

12  court held that the privilege does not apply to conduct that amounts to malicious prosecution.

13  Here, although plaintiff has not separately alleged it, the knowingly false report of trespassing,

14  triggering an unlawful detention, did in fact constitute the tort of malicious prosecution.

15      "Malicious prosecution consists of the initiation and maintenance of legal proceedings

16  against another with malice and without probable cause." 5 Witkin, Summary of California Law,

17  §469, at p. 696 (citing cases). It is undisputed that when they arrived on the scene on July 23, the

18  campus police were responding to a "proceeding" initiated by Robinson [Ex. 8]. It is only

19  required that Robinson's report "instigated or procured" the legal action. *Jacques Interiors v.

20  Petrak*, (1987) 188 Cal.App.3d 1363, 1371-72. The resulting detention, a liberty deprivation,

21  was unsupported by probable cause because plaintiff returned to the library as a matter of right,

22  already having suffered the maximum exclusion permitted.

23      The "proceeding" terminated favorably on the merits for plaintiff the next day, when the

24  matter was voluntarily dismissed. "A voluntary dismissal, even one without prejudice, reflects

25  on the merits. Although not res judicata, it is generally a favorable termination." 5 Witkin,

26  Summary of California Law, §501 at p. 735. If the matter had been tried, plaintiff would

27  necessarily have prevailed on the merits because given the effect of Penal Code § 626.6, the

28  detention was unsupported by "reasonable suspicion" as a matter of law. Discovery of a warrant

20

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

does not cleanse an unlawful detention. *Moreno,* supra, 431 F.3d at 641. Plaintiff has also alleged that the warrant itself was a mistake, resulting from the fact that the underlying citation requiring the court appearance did not show up in the court's system when plaintiff appeared to pay it [A.C. ¶17]. Since the pleaded facts satisfy the elements of a claim for malicious prosecution, *Hagberg* precludes application of the §47(b) privilege.

The court should also decline to apply §47(b) on a separate ground. In *Hagberg, supra,* the California Supreme Court specifically noted that plaintiff had not alleged violation of any constitutionally based right. By contrast, here the interference was with plaintiff's constitutional rights of free speech and physical liberty. The vindication of such rights cannot be subordinated to a mere statutory privilege.

## VI.

### PLAINTIFF IS ENTITLED TO PRELIMINARY INJUNCTIVE RELIEF

In the Ninth Circuit, a plaintiff is entitled to a preliminary injunction on a showing of either (1) a likelihood of success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in [his] favor." *Sammartano v. First Judicial District Court,* 303 F.3d 959, 965 (9th Cir. 2002). Loss of First Amendment freedoms, for even minimal periods of time, "unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Since plaintiff has already lost over ten months of library use, the key inquiry is the likelihood of success on the merits.

As shown above, the alleged "policy" banning all speech about quiet is likely to fall under the weight of *Baca* and *Sammartano, supra.* The court should therefore grant a preliminary injunction now, saving all concerned much time and effort in the coming months.

Dated:    May 27, 2008.

Keith Galiano
Plaintiff Pro Se

21

Plaintiff's Opposition To Motion To Dismiss [Revised]
Case No. C07-05557 SBA

## DECLARATION OF PERSONAL SERVICE

On May ___, 2008, I served true copies of the attached:

**Plaintiff's Memorandum in Opposition to Motion to Dismiss;**
**Exhibits; Proposed Order**

on counsel for defendants in this matter by delivering same by hand to the following address:

Michael A. Laurenson, Esq.
Gordon & Rees
275 Battery Street, Suite 2000
San Francisco, CA 94111

I declare that the foregoing is true and correct and that this declaration was executed on
May ___, 2008 at San Francisco, CA.

_____
Keith Galiano

Declaration of Service (Memo. Opposition)

# EXHIBIT 1



| | | |
|---|---|---|
| **Home** | **Sitemap** | **Search** |

## Mission Statement

The Institute of Governmental Studies (IGS), established in 1919, is an Organized Research Unit of the University of California at Berkeley. The IGS mission is to conduct and disseminate research on topics related to state and national politics and public policy topics with a particular focus on institutional design and reform. IGS serves as the University's primary center for advancing research and public service on applied political science and public policy. IGS serves students, faculty, researchers, and the general public.

The IGS mission is to inform the construction and debate of reform proposals through applied research disseminated whenever possible through non-technical reports and public conferences. IGS serves as a bridge between academia and the intersection of politics, policy and the media.

---

## ABOUT THE INSTITUTE

- Director's Introduction
- An Overview of IGS
- History
- Research Overview
- Active Research Projects
- Research in the Works
- Funding Opportunities
- NSF Grant Proposal Quick Guide
- Public Service

- People
- Staff
- Contacts
- Visiting Scholars
- Associated Faculty
- Graduate Students
- Directions to the Institute
- Friends of IGS
- IGS Faculty Advisory Committee
- IGS National Advisory Council

# EXHIBIT 2



---

**About IGS ::: National Advisory Council**

# IGS National Advisory Council

The IGS National Advisory Council is responsible for providing guidance and direction to advance the Institute's development and outreach efforts. Membership is composed of distinguished individuals representing the corporate, philanthropy, non-profit, professional, and academic sectors that are affiliated with the IGS mission. Below is the 2007-2008 roster of membership.

**Note:** For biographies of individual council members, please click on each council member's name in the list below. For printer-friendly biographies, click the print box next to each council member's name, which will take you to a separate printer-formatted bio page.

In addition, a full compendium of IGS National Advisory Council member biographies is available as a PDF document here.

---

## IGS Inaugural Salon Dinner

The IGS Inaugural Salon Dinner was held on March 17, 2007 at The Anderson Ranch in Kenwood, California. For links to the invitation to this event, to photographs of the event, and to a brief biography of the speaker, Shibley Telhami, please visit the event web photograph album.

---

## National Advisory Council Member Biographies

**Darius Anderson**     print

*Chair*
Platinum Advisors

**Douglas Boxer** ['88]  `print`
Renewable Resources Group

**William Brandt**  `print`
Development Specialists Inc.

**Bryan Cameron**  `print`
Dodge & Cox Funds

**Darek DeFreece** ['93]  `print`
Wells Fargo Bank

**Stephen Dodson** ['99]  `print`
Parnassus Investments

**James Fang** ['85]  `print`
Asian Week

**Karen Getman**  `print`
Remcho, Johansen & Purcell

**Peter Hart**  `print`
Peter D. Hart Research Associates

**Kevin Johnson** ['87]  `print`
St. HOPE Public Schools

**Priya Mathur** [MBA '03]  `print`
California Public Employees' Retirement System (CalPERS)

**Laurence Pelosi** ['94]  `print`
Morgan Stanley

**Dan Schnur**  `print`
Edelman Public Relations

**Lisa Suennen** ['86, MA '87]  `print`
Psilos Group

**Duf Sundheim**  `print`

**Kris Van Giesen** ['87]  `print`

# EXHIBIT 3

Friends of IGS Newsletter Summer 2000 (pdf format)

## IGS MEMORIAL FUNDS AND LECTURES

Nelson W. Polsby Memorial Graduate Student Fund

Victor Jones Memorial Lecture on Metropolitan Governance

## FRIENDS OF IGS HONOR ROLLS

Friends of IGS Honor Roll 2006

## IGS BENEFACTORS

IGS has benefited from the generosity of numerous benefactors. Some notable IGS benefactors include:

Joseph P. Harris
Franklin K. Lane
Dorothy C. Tompkins
Eugene C. Lee
Darius Anderson
William Brandt, Jr.
Fred Martin, Jr.

## IGS GIFTS

Gift from Darius and Sarah Anderson, October 2007

## HOW GIFTS TO IGS ARE USED

University financial support of the Institute accounts for only 24% of total annual IGS funding. The remainder of the IGS operating budget comes from a variety of sources: endowment income, contracts and grants, faculty opportunity funds, federal, state and local extramural funds, revenue generating enterprises and private gifts and donations. The importance of private development and fundraising activities as an essential component of the Institute's fiscal future has taken on a new sense of urgency. Simply stated, without a strong base of private donor support, IGS cannot compete and maintain its excellence in serving as the University's primary center for the interdisciplinary study of American politics, governance and public policy.

To address this emerging imperative, the Friends of IGS was established in 1995 as an official University-sanctioned outside support group. Friends is a donor club that channels much needed fresh financial resources into Institute activities and programs. Membership in Friends is automatic once a gift, no matter how small, is given to IGS. The benefits from joining Friends are many, but most important is the fact that by giving an individual, firm, or foundation is directly contributing to maintaining the excellence of Berkeley. Members also receive a special annual newsletter, automatic free subscriptions to the Public Affairs Report and IGS Calendar, and the intrinsic reward of knowing that their dollars are helping to prepare the next generation of leaders who study and train with IGS as students. In addition, all contributions are tax deductible.

# EXHIBIT 4

IGS serves the needs of its students in several ways. First, we employ both undergraduate and graduate students in faculty-led collaborative projects on such topics as Constitutional Revision, the California Political Reform Act study, and the Blanket Primary. Second, we give graduate students research apprenticeship appointments and small direct grants to support their own studies and to foster their independent creativity based on need and merit. Third, IGS uses students for as many administrative support functions as possible, providing a valuable form of financial aid for undergraduates and places the most capable undergraduates into faculty-led research teams.

## Extramural Funds

IGS has raised over $4 million in the last five years in extramural funding from such diverse sources as the California State Legislature, Public Policy Institute of California, Ford Foundation, National Science Foundation, and the U.S. Department of Education. On an annual basis, the IGS Library generates about $120,000 in research service contracts and enterprises; the IGS Press generates $110,000 in book sales; and the Statewide Database generates $540,000. In addition, IGS receives about $40,000 to $50,000 annually from private donations and has a current endowment worth almost $5.8 million

## Research

IGS has demonstrated in recent years an ability to organize and fund path-breaking research in the areas of institutional design and reform. The Constitutional Revision and Blanket Primary projects drew together scholars from across the UC system and in several disciplines to analyze important contemporary institutional issues-specifically, how should the California Constitution be reformed, and what impact has the change in primary rules had on the political system? In addition, IGS sponsors an extensive array of seminars on topics from game theory to political history, creating an intellectually stimulating environment that facilitates new advances in the social sciences.

## Resources and Facilities

Part of the IGS mission is facilitating and disseminating research. IGS has several resources that cannot be found anywhere else in the state that allow it to play this role. The IGS Library is a valuable and unique national collection of fugitive research materials. The Statewide Database provides merged census and political data in a GIS format that will be used by the state of California and many localities for redistricting purposes in 2001. IGS Press is a model of success in small press social science publishing and is poised to enter into more formal collaborations with UC Press and other campus social science units.

## Public Service

In addition to our conferences and seminars, IGS provides valuable public service to the campus and state of California in various ways. The Institute regularly hosts visits by public officials to the campus and is charged by the chancellor's office to improve campuswide contacts with state government leaders. The Institute is the key campus resource for information about politics and public policy for members of the press and general public. The IGS Library and Statewide Database answer thousands of public queries every year. IGS serves a very critical role as the point for entry into the university for congressional, state legislative and executive officials and local government leaders.

We encourage you to survey our website and become more acquainted with our resources and

# EXHIBIT 5



About IGS ::: Research & Programs ::: Active Research Projects

## Institute of Governmental Studies | UC Berkeley

# Active Research Projects

| Principal Investigator | Project Title | Funding Agency |
|---|---|---|
| Cain, Bruce E. | Immigration, Segregation and Urban Tension in France and California | France Berkeley Fund |
| Cain, Bruce E. | Nesting and Redistricting in California | James Irvine Foundation |
| Citrin, Jack | Immigration, Ethnic Diversity and Democratic Inclusion | Berkeley Futures Research Grant Program |
| Rasky, Susan | A Survey of the Political Attitudes and Patterns of Political Participation of the Iranian American Community | Private Research Gift |
| Roland, Gerard | Voteworld: Comparative Legislative Behavior | National Science Foundation |
| Schickler, Eric | Collaborative Research: The American Mass Public in the 1930s and 1940s | National Science Foundation |
| Simon, Jonathan | Mental Illness and the Law | San Francisco Foundation |
| | | |

| Vogel, David J. | California-EU Regulatory Cooperation Project | German Marshall Fund of the United States |
| --- | --- | --- |
| Vogel, David J. | Managing Biosafety and Biodiversity in a Global World: EU, US, California and Comparative Perpectives | European Commission |
| Weir, Margaret | Federalism and Strategies for Reform in American Health Policy | Robert Wood Johnson Foundation |

Active Research Projects ::: About IGS ::: Research in the Works

# EXHIBIT 6

Case 3:07-cv-01658-SBA Document 55    Page 1 of 1

# Library
**Institute of Governmental Studies**

109 Moses Hall #2370
University of California
Berkeley, CA 94720-2370

(510) 642-1472
(510) 643-0866 (f)

| Home | Sitemap | Search |
| --- | --- | --- |

# Overview

The Institute of Governmental Studies Library is one of the nation's premier libraries of nontrade and ephemeral materials on American public affairs and policy. Pamphlets and unbound reports from a broad spectrum of public interest organizations, research institutes and government agencies are the heart of the collection. The Library also has a strong core collection of books and journals on American political science and public administration.

The Library has served the research and public service mission of the Institute of Governmental Studies for over 70 years. It was organized in 1921 at the founding of the Institute, then known as the Bureau of Public Administration, and has evolved into a large specialized library serving not only Institute scholars but the University community and the general public.

With continuing advances in information technology, the Library's resources have expanded to include not only the on-site collection, but the online resources of the digital age. The Library remains a repository of unique and valuable materials, and it also offers state-of-the-art electronic information services.

The Library is one of several large specialized libraries on the Berkeley campus affiliated with research institutes and professional schools, and independent of the campus library system.

## Staff

**Nick Robinson**, Library Director
**Frank Lester**, Electronic Services Librarian
**Mark Takaro**, Library Assistant, Chief Cataloger
**Ben Burch**, Library Assistant, Serials, Stack & Purchasing Manager
**Paul King**, Library Assistant, PPIC Liaison

*To  Collection*

# EXHIBIT 7



## Library Code of Conduct

### Introduction

The IGS Library strives to provide for its authorized users:

1. access to library materials or an ability to recall them according to library policy
2. journals, documents and books that are complete and unmarked
3. surroundings and library collections free from the problems caused by food, beverages, and other damaging substances
4. a library environment suitable for reading, study and activities in support of campus research and instructional programs.

### Prohibited Behaviors  top

Certain behaviors, detailed below, are in conflict with these goals.

### *Use and protection of the Collections*

1. Removing or attempting to remove library materials, equipment or property without proper checkout or other official library authorization.
2. Failing to either renew or return library materials when due.
3. Concealing library materials in the Library for the exclusive use of an individual or group.
4. Mutilating library materials by marking, underlining, removing pages or portions of pages, removing binding, removing electronic theft devices, using post-its and paper clips or in any other way damaging or defacing library materials.
5. Eating and drinking in the Library.
6. Smoking in buildings or near entrances and exits.
7. Use of smokeless tobacco.
8. Failing to adhere to copyright laws, including systematically downloading, printing, or disseminating content from UCB-licensed electronic resources in violation of

copyright laws.

## *Use and protection of the building and library equipment* 

9. Being in unauthorized areas of the Library, remaining in the Library after closing or when requested to leave during emergency situations, drills or when not abiding by The Library's Conduct Policy.
10. Opening emergency exits except in emergency situations.
11. Parking wheeled vehicles in unauthorized areas outside or inside the Library.
12. Vandalizing or defacing the Library building, furniture or equipment.
13. Maliciously accessing, altering, deleting, damaging or destroying any computer system, network computer program or data.

## *The Library Environment* 

14. Causing a disturbance or engaging in any behavior which interferes with Library activities. Proscribed behavior includes (but is not limited to) verbal abuse, threats of violence, sexual harassment, or use of "fighting words" to harass any person. (See "The University of California at Berkeley Code of Student Conduct)
15. Rollerblading, skateboarding or skating on Library property.
16. Carrying weapons in the Library unless authorized by law.

## *Library fees* 

17. Failing to pay library fees.

## Sanctions 

Any patron who commits or attempts to commit any of the offenses listed above -- or any other behaviors illegal under the laws of the state or federal government -- is subject to sanctions, including

- being a sked to leave Library premises;
- being re ported to the police; and
- l egal prosecution.

*Back to the Collection*

# EXHIBIT 8

| CONTINUATION REPORT | UNIVERSITY OF CALIFORNIA POLICE DEPARTMENT BERKELEY CA 0019700 | 2. CASE NUMBER 07-03073 |
|---|---|---|
| 1. ☒ INCIDENT REPORT ☐ CRIME REPORT ☐ ARREST REPORT | | 3. PAGE 1 OF 1 |

| 4. TYPE REPORT ☐ ORIGINAL  ☒ SUPPLEMENT | 5. CODE SECTION/DESCRIPTION N/A | 6. CRIME Warrant Arrest | |
|---|---|---|---|
| 7. INCIDENT DATE 07/12/07  TIME 1453 | 8. INCIDENT LOCATION Bridge south of Moses Hall | 9. ADDL. NAMES ATTACHED ☐ YES ☒ NO | |

**10. NARRATIVE**

On 07/23/07 at approximately 1453 hours, I was dispatched to the report of a trespasser in the library located in room 109 Moses Hall. As I approached the building from the south I was contacted by (RP) ROBINSON, Nicholas Keith (MW-53-E). (RP) ROBINSON, the director of the Moses Library, informed me that a subject who had previously been asked to leave the library had returned to the library. (RP) ROBINSON informed that the subject had been disruptive, argumentative and verbally abusive in the library approximately two weeks ago (see case #07-02961). (RP) ROBINSON told me that before leaving the library the subject threatened to sue both (RP) ROBINSON and the University. (RP) ROBINSON pointed out the subject who was walking southbound towards the east breezeway of Barrows Hall.

The subject was a white male with brown hair wearing an off-white shirt and blue jeans. The subject turned and observed that (RP) ROBINSON and I were talking. The subject then started walking towards our location. The subject than began demanding to know what (RP) ROBINSON was talking to me about and what he was being accused of. Ofc. Watts #53 asked the subject to speak with him. Ofc. Watts identified the subject as (S) GALIANO, Keith Charles (MW-50-O). A records check of (S) GALIANO revealed a misdemeanor BART PD Warrant for 148.9(a) PC.

I attempted to discuss the situation that occurred in the library with (S) GALIANO and inform him that he needs to adhere to the rules of the library when using the library. (S) GALIANO became argumentative and verbally abusive with Ofc. Watts #53 and I. I placed (S) GALIANO under arrest for his outstanding warrant. (S) GALIANO was handcuffed by Ofc. Watts #53. I checked the handcuffs for proper fit and double locked them. Ofc. Watts #53 transported (S) GALIANO to BPD jail for me.

Nothing further.

CONTROLLED DOCUMENT
DO NOT DUPLICATE
UNIVERSITY OF CALIFORNIA
POLICE DEPARTMENT

Galiano  13 S  12-17-07
ROUTED TO    ROUTED BY    DATE

| 11. COPIES TO: ☒ DETECTIVES ☐ PATROL ☐ DISTRICT ATTY. ☐ RISK MGT. ☒ E.H&S ☐ OTHER ☐ OTHER | | | |
|---|---|---|---|
| 12. REPORTING OFFICER N. Miller #32 | 13. DATE AND TIME 07/24/07 1400 | 14. APPROVING SUPERVISOR | 15. DATE 7/24/07 |

**RECEIVED**

MAY 27 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| KEITH GALIANO, | Case No. C07-05557 SBA |
| Plaintiff, | |
| vs. | [PROPOSED] ORDER DENYING MOTION TO DISMISS |
| INSTITUTE OF GOVERNMENTAL STUDIES AT THE UNIVERSITY OF CALIFORNIA AT BERKELEY, an unincorporated association, NICK ROBINSON, DOES 1-5, inclusive, | |
| Defendants. | |

## BACKGROUND

In this action pursuant to 42 U.S.C. § 1983 and the California Bane Act (Civil Code § 52.1), plaintiff challenges the constitutionality of a speech prohibition in a public library, and alleges three distinct instances of retaliatory deprivation resulting from his attempt to question the subject policy. The defendants named are the Institute of Governmental Studies (IGS), which operates the library on the campus of the University of California at Berkeley, and Nick Robinson, the library Director.

1

1    The regulation at issue, which is unwritten and does not appear in the IGS library's Code

2    of Conduct, prohibits library patrons from speaking to each other directly about issues of quiet,

3    requiring them to filter such requests or complaints through library staff, and is expressly justified

4    as a prophylactic against possible "disputes."

5          The action arises from defendants' invocation of this policy on July 16, 2007.  Plaintiff

6    alleges that he was a consistent user of the library with no history of conflict there, and that he was

7    the only patron in the room when a woman entered and began speaking excitedly to the desk

8    librarian in an unusually loud voice.  Plaintiff states that he politely asked — "not quite so loud?"

9    — and that she readily agreed.  Despite the absence of any rancor or disturbance, the librarian

10   summoned Robinson, the library Director, who appeared a few minutes later and said he "needed

11   to speak" to plaintiff about addressing other patrons.   When plaintiff asked how the courteous

12   request he made could be a problem, Robinson said, "we prefer that you go through staff."  No

13   notice of any such rule was posted in the library.

14         Surprised, plaintiff asked Robinson if such a rule had actually been promulgated, but

15   Robinson refused to answer.  Since Robinson had been somewhat officious toward plaintiff a few

16   days before, plaintiff tried to ask him if something personal was involved, but before he could get

17   these words out, Robinson ordered him to leave the library, threatening to call the police.  Plaintiff

18   then told Robinson he would sue, called him a "son-of-a-bitch," and left as ordered.

19         It is undisputed that Plaintiff stayed away from the library for a full week, then returned on

20   July 23 for a few minutes, and was not asked to leave.  As plaintiff left the library building, he was

21   detained for investigation by campus police officers, who told him that Robinson had reported him

22   as a trespasser.  The officers refused to let plaintiff leave the scene though he requested to do so.

23   They discovered that the Alameda County Superior Court had issued a bench warrant for

24   plaintiff's arrest for a failure to appear.  They arrested plaintiff, and he spent 28.75 hours in jail.

25   Plaintiff alleges that the warrant had been issued erroneously, due to an administrative mix-up in

26   which the subject citation did not appear in the court's system when he timely appeared at the

27   court to pay it. The police report reflects that in reporting plaintiff as a trespasser, Robinson was

28   referring to the incident of one week before, in which plaintiff had threatened to sue and, in

[Proposed] Order Denying Motion to Dismiss
Case No. C07-05557 SBA

Robinson's formulation, had been "abusive." Plaintiff alleges that because Robinson or his staff might report him as a "trespasser," again, he never returned to the library after July 23, 2007, and accordingly suffered an extended exclusion at least between July 23 and October 3, 2007, when the director of IGS told plaintiff he could return so long as he observed the alleged policy against asking other patrons for quiet.

## LEGAL STANDARD

On this motion to dismiss under Rule 12(b)(1) and (6), the court accepts as true all relevant facts pleaded, as well as reasonable inferences therefrom. *Pareto v. F.D.I.C.*, 139 F.3d 696 (9th Cir. 1998). Defendants introduce extrinsic evidence in the form of web pages from university-related web sites, and plaintiff supports his Opposition by reference to similar documents. The authenticity of all of these materials is undisputed, and therefore their consideration on the motion is proper. The court is required to permit plaintiff to amend unless the deficiency alleged cannot possibly be cured. *Cook, Perkiss & Liehe v. Northern California Collection Service, Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

## ANALYSIS

### Subject Matter Jurisdiction

The Regents of the University of California claim that the Institute of Governmental Studies, the named entity defendant, is sued erroneously, that the Regents are the proper entity defendant, and that the court therefore lacks subject matter jurisdiction over claims other than those against Robinson personally because the Regents are an "arm of the state" entitled to immunity from suit in federal court under the Eleventh Amendment. Plaintiff responds that under both California and Federal law, IGS is an "unincorporated association" with capacity to defend in its own name, with the result that the Regents need not be a party and no subject matter jurisdiction obstacle exists.

Plaintiff is correct. IGS appears to be a think tank of sorts, not actually fulfilling any governmental function. Statements appearing on the IGS website make clear that the Regents provide only 24% of its funding, that it is largely privately financed and directed, that it has an independent income-generating capacity and a private endowment of $5.7 million, and that its

3

[Proposed] Order Denying Motion to Dismiss
Case No. C07-05557 SBA

1   library, source of this dispute, is "independent of the campus library system." Since IGS appears

2   capable of satisfying a judgment from its own funds, without resort to the university or state

3   treasuries, it qualifies as an unincorporated association and may be sued in federal court under

4   FRCP 17(b)(3) and/or 17(b)(3)(A). *Johnson v. Chilcott*, 599 F.Supp. 224, 230 (D.Colo. 1984);

5   *E.E.O.C. v. St. Francis Xavier Parochial School*, 77 F.Supp.2d 71, 77 (D.D.C. 1999).

6          Defendants cite *Lippoldt v. Cole,* 468 F.3d 1204 (10th Cir. 2006), for the proposition that

7   even if IGS is an "unincorporated association," such an entity cannot be a "person" § 1983. While

8   the case does so hold, the court declines to follow it because, as plaintiff correctly points, the

9   recent history of § 1983 reflects a diminishing focus on "legislative intent," the lynchpin of the

10  analysis in *Lippoldt.* Since 19th-century legislative "intent," no longer constrains the substantive

11  reach of § 1983, the court sees little reason why it limits the range of suable entities.

12          Constitutionality Of The IGS Speech Policy

13         Defendants claim that their unwritten (and possibly fictitious) library ban on inter-patron

14  speech about quiet is justified because such speech might "lead to disputes." At this stage, there

15  can be no showing that such a danger actually exists, but in any event such a content prohibition

16  arrives in court with a nearly insurmountable presumption of unconstitutionality.

17         In contending for application of a "reasonableness" test, defendants cite *Kreimer v. Bureau*

18  *of Police*, 958 F.2d 1242 (3rd Cir. 1992), but in that case the court was addressing "manner"

19  regulations that did not burden communicative content. Even under a "reasonableness" test, a jury

20  could find that the supposed rule is unreasonable, given that IGS apparently does not consider the

21  matter serious enough to include the rule in its otherwise detailed "Code of Conduct." But since

22  IGS justifies the policy by reference to listener reaction, it cannot be a "time, place or manner"

23  regulation. And since plaintiff is proceeding first under the California constitution, whose

24  protections for speech are "broader and greater" than those under the First Amendment, *Fashion*

25  *Valley Mall, LLC v. National Labor Relations Bd., (2007) 42d Cal.4th 850, 862-63,* it is apparent

26  that a more stringent standard applies.

27         Even under the First Amendment, "undifferentiated fear or apprehension of disturbance is

28  not enough to overcome the right to freedom of expression." *Tinker v. Des Moines Independent*

4

*Community School Dist.*, 393 U.S. 503, 508 (1969).  In *Baca v. Moreno Valley Unified School Dist.*, 936 F.Supp. 719 (C.D. Cal. 1996), the court granted a preliminary injunction against a school board rule prohibiting public criticism of school district officials at school board meetings. Defendants tried to justify such a flat prohibition, which the court described as "censorship," by pointing to the danger of defamation and the consequent need to protect public reputations. Assuming the potential for defamation existed, the court found it an insufficient interest to overcome rights of free speech.  In *Sammartano v. First Judicial District Court,* 303 F.3d 959, 965 (9th Cir. 2002), state officials justified a rule that prohibited the wearing of clothing bearing the insignia of motorcycle clubs in a courthouse on the ground that some persons had reported feeling threatened by such garb.  The court found this an insufficient justification for the rule, and reversed denial of a preliminary injunction against the rule.  IGS's position here appears to be essentially indistinguishable from that of the government defendants in *Baca* and *Sammartano*. A flat ban cannot be justified by the mere possibility that other library users will react hysterically to even a courteous request for quiet.  Defendants in essence are asking the court to approve a "heckler's veto."  The subject library "policy" will most probably fail.

> The §1983 Claims

The two essential elements of a claim under § 1983 are (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that such conduct caused deprivation of a right, privilege or immunity secured by the Constitution.  *Monroe v. Pape*, 365 U.S. 167 (1961).  Retaliation for the exercise of protected speech is actionable under 42 U.S.C. § 1983.  *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287 (1977).  It appears to be undisputed that Robinson, in ejecting plaintiff from the library and in reporting him as a trespasser a week later, was attempting to punish plaintiff's attempt to question him about the supposed policy against direct speech about quiet in the library.

Defendants justify the ejection by suggesting that plaintiff should have written a letter rather than trying to question Robinson in the library.  There is no authority for any such rule.  As recently stated in *Glair v. City of Los Angeles*, 2008 U.S.Dist. [LX 24519], mere criticism of a public official is protected free speech."  In addition, Penal Code § 626.6 essentially sanctifies all

1  speech on a public campus that does not imminently threaten substantial disruption of "the

2  peaceful conduct of … activities … " It appears undisputed that plaintiff made his request in an

3  empty room, meaning there was no real potential for disturbance, but in any event the court can

4  hardly assume that students at Berkeley would be "disturbed" by a bit of colloquy in which

5  designated authority faced a challenge. Plaintiff has alleged that he suggested going outside and

6  that Robinson insisted on staying in the library. Defendants contend that in calling Robinson a

7  "son-of-a-bitch," plaintiff departed the realm of protected speech. However, plaintiff has pleaded

8  that he delivered that epithet only after being ejected, not before, and such a comparatively mild

9  epithet should not be surprising from one unfairly booted from a library. Moreover, government

10 officials, even the most petty, are required to endure at least modest abuse. *Duran v. City of*

11 *Douglas*, 904 F.3d 1372, 1378 (9th Cir. 1990).

12       Penal Code § 626.6 is also determinative with respect to the "trespass" report and resulting

13 detention when plaintiff returned to the library after a one-week hiatus. Absent special written

14 notice, which did not occur here, the statute limits the duration of summary exclusions to a

15 maximum of 7 days, meaning that plaintiff's return to the library on July 23 was fully privileged

16 and he could not have been a "trespasser" simply for doing so. Robinson's report of trespassing

17 was therefore objectively unreasonable. It is not disputed that plaintiff's detention by the police

18 followed directly from Robinson's report.

19 <u>Equal Protection</u>

20       Adverting to the fact that the IGS library's posted "Rules of Conduct" are silent about any

21 rule against directly asking other persons for quiet, plaintiff alleges that the rule does not actually

22 exist and that its invocation against him was therefore a denial of equal protection.

23       Defendants contend that this does not adequately allege an equal protection "class of one"

24 claim. However, the very authority defendants cite, *Willowbrook v. Olech*, 528 U.S. 562, 564

25 (2000), holds that a "class of one" claim properly lies, even absent an allegation of membership in

26 a recognized protected class, where plaintiff alleges he was intentionally treated differently from

27 others similarly situated, without rational basis. 528 U.S. at 564. Plaintiff's allegations meet the

28 *Willowbrook* standard for pleading a "class of one" equal protection claim.

[Proposed] Order Denying Motion to Dismiss
Case No. C07-05557 SBA

Qualified Immunity

Qualified immunity is not available for the retaliatory acts allegedly engaged in by Robinson, because in each instance the constitutional right retaliated against was well-established in July 2007.

The initial library ejection occurred when plaintiff tried to question Robinson about the existence of and basis for what has to be considered a novel restriction on speech. Taking as true plaintiff's allegation that his questioning was peaceful, it was protected under both the California and Federal constitutions, even if it was something of a challenge to Robinson's authority. Plaintiff has alleged that he called Robinson a "son-of-a-bitch" only after being ejected, and this sequence is apparently not disputed, but in any event officials are required to tolerate at least a moderate amount of abuse. <u>See</u>, *Duran v. City of Douglas*, 904 F.3d 1372, 1378 (9th Cir. 1990). This having been an empty room, there is no serious argument that disruption of the facility was actually threatened. Summary exclusions from public university facilities must be founded on conduct that actually threatens such disruption of operations. Penal Code § 626.6, *Braxton v. Municipal Court*, 10 Cal. 3d 138 (1973). This was well-established in July 2007.

The same is true of the detention plaintiff suffered on July 23. It was well-established that a citizen has a right to be free from unreasonable personal seizure. Since Penal Code §626.6 limits summary campus exclusions, even where otherwise justified, to 7 days, plaintiff could not have been a trespasser and so his detention was necessarily unsupported by any "reasonable suspicion" of crime. All agents or employees of IGS should have known this. The detention was not any less unlawful because a bench warrant was subsequently discovered. *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005).

The Bane Act Claims

Plaintiff has properly pleaded claims under California's Bane Act. There is no authority for defendants' position that the conduct complained of, i.e. ejection from the IGS library and subjection to unlawful personal seizure through bad faith report of trespassing, was "speech alone," which would be disqualifying under the Act, rather than conduct. In *Long v. Valentino*, 216 Cal.App.3d 1287 (1989), an action under California's Unruh Civil Rights Act, the court held

7

[Proposed] Order Denying Motion to Dismiss
Case No. C07-05557 SBA

that a discriminatory ejection from a public meeting was caused by a simple verbal order to leave. The Bane Act does not require either a "hate crime," or physical touching. *Jones v. Kmart Corp.*, 17 Cal.4th 329, 338 (1998); *O'Toole v. Superior Court*, 140 Cal.App.4th 488, 502 (2006).

The absolute privilege of Civil Code §47(b), applicable to reports initiating investigation of crime, does not apply in this case. It could not apply to Robinson's ejection of plaintiff from the IGS library because that did not involve institution of any official proceeding. It does not apply to Robinson's report of trespassing on July 23, 2007 because that act amounts to malicious prosecution, which is an exception to the privilege's coverage. *Hagberg v. California Federal Bank*, 32 Cal.4th 350, 355 (2004). Had it proceeded to completion, any "proceeding" kicked off by that report would necessarily have terminated in plaintiff's favor on the merits, because under the controlling statute it was legally impossible for plaintiff to have been a trespasser at the IGS library on July 23, 2007. The court also declines to apply the §47(b) privilege on the separate ground that the rights plaintiff seeks to vindicate in his Bane Act claims are constitutionally based, and cannot be subordinated to a mere statutory privilege. In *Hagberg*, *supra*, the California Supreme Court specifically noted that plaintiff in that case had not based her claim on the violation of rights of any similar status.

## DISPOSITION

The motion is DENIED in its entirety. In addition, defendants IGS and Robinson are preliminarily enjoined from (1) enforcing any flat prohibition on inter-patron speech about quiet in the IGS library; (2) prohibiting any speech that does not present an immediate and material threat to proper library functioning; (3) applying any rule to plaintiff that does not apply to other library users; (4) retaliating in any way against plaintiff in his future use of the library. Defendants are also directed to immediately restore plaintiff to enjoyment of the facilities that were available to him in the IGS library as of July 16, 2007, including unrestricted internet access.

IT IS SO ORDERED.

_____
Saundra B. Armstrong
United States District Judge

8

[Proposed] Order Denying Motion to Dismiss
Case No. C07-05557 SBA